THE STATE OF NEVADA, RESPONDENT, *v.* PAUL CUSHING AND R. L. RANKIN, APPELLANTS.

No. 3343

December 16, 1941. 120 P. (2d) 208.

*Anthony M. Turano,* of Reno, for Appellants.

*Gray Mashburn,* Attorney-General, *W. T. Mathews* and *Alan Bible,* Deputy Attorneys-General of Carson City; *Ernest S. Brown,* District Attorney, and *Myron R. Adams* and *Nash P. Morgan,* Deputy District Attorneys of Reno, for Respondent.

## OPINION

By the Court, DUCKER, C. J.:

The appellants, Cushing and Rankin, together with Ruth Barnett and Valentine St. John, were charged in the district court with a felony. The charging part of the information is as follows: "That the said defendants on the 14th day of November, 1940, or thereabouts, and before the filing of this information, at and within the County of Washoe, State of Nevada, did then and there willfully, unlawfully and feloniously use and employ a certain instrument, the exact nature of which said instrument is to this affiant as yet unknown, in and about and upon and within the body of one B. Price, the said B. Price being then and there a woman pregnant with child, as defendants then and there well knew, with intent thereby, then and there, to procure the miscarriage of her, the said B. Price, the use of said instrument as aforesaid not being then and there nor at all necessary to preserve the life of the said B. Price, or that of the child whereof she was pregnant."

The appellants pleaded not guilty. The jury found them guilty as charged in the information. During the course of the trial the defendant Ruth Barnett, on motion of the district attorney, was discharged and became a witness for the state.

The defendant Valentine St. John, who had been admitted to bail, failed to appear for trial. Cushing and Rankin have appealed from the judgment and order denying their motion for a new trial.

The state does not contend that appellants actually committed the acts alleged in the information, or that being present they participated in their commission. It was the theory of the state that prior to the time alleged in the information appellants and defendants St. John and Barnett entered into a common plan or scheme to perform unlawful abortions in the state of Nevada, and that pursuant thereto Ruth Barnett performed the acts

alleged in the information, and that by reason of such plan or scheme appellants became accessories before the fact to the crime chargeable and punishable as principals. The trial court instructed the jury to that effect.

Before passing on the number of errors assigned, it is deemed advisable to state the facts which the state claims show such common plan or scheme on the part of the persons heretofore designated. In this statement they will be referred to as Cushing, Rankin, St. John and Ruth Barnett.

During the month of July 1940, Rankin and Cushing resided in San Francisco, California, St. John resided in Oakland, California, and Ruth Barnett resided in Portland, Oregon. According to her testimony she was a naturopath and had been engaged in performing abortions. Rankin, who had known her and St. John for several years, went to Portland in the month of July where he had arranged to meet her, and explained to her that he wanted to promote a big spa at Steamboat Springs, Nevada. Shortly afterwards she flew down to San Francisco and met Rankin, who flew with her to Reno and together they visited Steamboat Springs and Lawton Hot Springs in that vicinity.

In the first part of July, Rankin was in Reno and visited Norman Biltz, a real estate broker, at the latter's office, representing to Biltz that he was in the finance business and wanted office space in Reno. Biltz suggested that he look at the E. C. Lyon Building, of which he was part owner and manager. Rankin inspected the premises the same day and returned to the office and inquired about the rent and as to whether the offices would be redecorated. He said that he saw some adjoining space there that some clients of his in California, that he did some financing for, might be interested in, and that he would see them in California. Later in July, according to Norman Biltz, Cushing came to his office in Reno and said that he had been in conversation with Rankin, who was secretary to St. John,

and they were interested in opening a clinic in Reno. They discussed the space in the Lyon Building, what improvements could be put in by the building, and the type of lease. A lease was executed on the 16th day of July 1940 for the space in the building which composed rooms numbered 301-2-3-4-5-6 and 7, between Biltz and associates, as lessors, and St. John as lessee, by his agent Cushing, for the term of five years commencing in September 1940, at a total rent of $12,225.

During Cushing's first conversation with Biltz concerning the procuring of office space in the Lyon Building, he explained what sort of medical work they contemplated doing in the Lyon Building, which was the treatment of women's diseases, and included curettements and abortions. He explained that St. John was retired but had controlled clinics which operated in the treatment of women's diseases and did curettements for doctors; that St. John had spent his lifetime developing the method and instruments that they used to do it, and that the doctors liked the technique they had developed over a period of thirty years, because it was painless and safe. Cushing said he would like to contact the doctors in the community to see if their services were wanted by them and asked Biltz what he thought the attitude of the community at large would be, and what the attitude of the law would be. Biltz said if they operated through the law he was sure they would have no trouble, and gave him a list of doctors in Reno.

Later, about the 20th of July 1940, Cushing came to the Biltz office in Reno with St. John, and a discussion ensued concerning Steamboat Springs. St. John said he was interested in purchasing Steamboat Springs and wanted to get a license in Nevada, but thought he could not get it in this state because of the fact that he was educated and graduated from a foreign university. Biltz sent him to see Dr. Cantlon of Reno concerning this. St. John was unable to obtain a license to practice in Nevada. Biltz, acting as agent for St. John, contacted

the owner of Steamboat Springs for the purpose of purchasing the property. The deal was never consummated.

Cushing was considerably exercised about the failure of St. John to obtain a license, and on July 31, 1940, in San Francisco, wrote to Biltz in Reno expressing his disappointment. In this letter he said: "The difficulty lies in our absolute necessity of having a regularly licensed physician to act as titular head of the Reno offices. You will understand that the disappointment regarding St. John's license was a considerable set-back in our plans. Efforts are now being made here to find a man eligible to receive a Nevada license for this purpose. In the interim, can you suggest a man in your locality who would, for a consideration, be interested in lending his name to the office? Naturally such an individual would have no responsibilities other than those implied in the use of his license and name."

Again, on August 9, 1940, from San Francisco, Cushing wrote to Biltz saying: "Our search for a proper man to head the Reno office continues; hence my delay in getting in touch with you this past week."

After efforts to obtain a license for St. John or a substitute to act in his stead had failed, Ruth Barnett came to San Francisco on August 19, 1940. Cushing met her at the St. Francis Hotel, drove her to Oakland and introduced her to St. John at the Leamington Hotel. A conversation took place between them relative to the premises, 307 Lyon Building, in Reno. They wanted her to go over and rush the completion of the carpenter work in fixing up the offices. At the time they both knew that she was an abortionist and it was understood that she was going to Reno to perform abortions in the premises known as 307 Lyon Building. Later in the day she had a discussion with St. John and Rankin as to what use was to be made of those premises. It was to be used as a clinic, St. John was going to take care of many kinds of cases and also therapeutic abortions. They wanted her to go there and arrange the office and

pick out furniture and drugs. It was understood that she was to perform abortions. Rankin had known for several years that she was an abortionist. Later she discussed that particular kind of work with St. John several times. On the 23d of September 1940, Rankin signed and executed a written contract with G. Warren Campbell, contractor for Biltz and associates, providing for the remodeling of the premises which had been formerly leased by the latter to Cushing. Prior to Ruth Barnett coming to Reno to work in and take charge of the Reno office of Cushing, Rankin, and St. John, and in Oakland, she and St. John and Cushing bought an operating table, knee crutches and surgical instruments to furnish the premises 307 Lyon Building in Reno. This equipment was shipped to Reno and used in the office in the Lyon Building. Certain abortion instruments were found in the Reno office in a bag at the time of the arrest of Ruth Barnett. She testified that she brought them with her from Portland.

Ruth Barnett came to Reno on the 14th of October 1940 in company with Rankin, and took charge of the premises 307 Lyon Building, picking out furniture for it and other items and generally arranging the whole office. In selecting these articles in Reno she was assisted by a Mr. Perry of Sparks, who had been introduced to her by Rankin in July. The latter told Perry as a favor to take her to the different establishments to make such selections. They were paid for by Perry with money furnished by Rankin, who said they were being made on behalf of St. John. When she came to Reno in October it was her understanding that St. John would get his license to practice in Nevada, and when he did not get it she made complaint to Rankin. The next day, November 2, 1940, Rankin, his son, and St. John went to Las Vegas, Nevada, to contact an old friend of St. John, one Dr. Z. A. d'Amours, who had a license to practice medicine in Nevada. They paid the latter $50, with the understanding that he would be

available to come to Reno to head the office. He was never notified to come to Reno, and never did so. He knew nothing of the unlawfulness in the set-up. On November 2, 1940, the day the trio went to Las Vegas, Ruth Barnett had the name "Z. A. d'Amours" painted on the door of room 307 in the Lyon Building. She did not know him. St. John told her to put the name on the door before he went to Las Vegas. On November 14, 1941, in the surgery room connected with room 307 Ruth Barnett performed an abortion upon the person of B. Price, named in the information.

Twenty-three errors are assigned and we have examined all of them. Some of them are trivial and 'will not be discussed.

■ The first assignment is that it was error to instruct that appellants could be convicted of an "unlawful abortion," since no such crime is charged in the information. There is no merit in this assignment. The crime of unlawful abortion by the use of an instrument is defined in sec. 10129 N. C. L. as follows:

"Every person, who, with intent thereby to produce the miscarriage of a woman, unless the same is necessary to preserve her life or that of the child whereof she is pregnant, shall—

"1. * * *

"2. Use, or cause to be used, any instrument or other means;

"Shall be guilty of abortion, * * *."

A reference to the charging part of the information will show that it contains all the elements of the crime thus defined. This information was read to the jury, both by the district attorney, after they were sworn, and by the court in its instructions. They knew, therefore, what acts were charged as an unlawful abortion.

■ The contention that the court, by the use of the phrase "an unlawful abortion" in its instructions, without defining what acts constituted the same, and that appellants were prejudiced thereby, is untenable. The

court did define these acts by repeating the language of the information. Moreover, the court instructed the jury in another instruction: "The law imposes upon the prosecution the duty of proving to the satisfaction of the jury beyond a reasonable doubt that the defendants are guilty in the manner and form as charged *in the information.* And I further instruct you that in this case the burden of proof rests upon the prosecution to make out and prove to the satisfaction of the jury, beyond a reasonable doubt, every material allegation *in the information,* and unless the same has been done, you should find the defendants, R. L. Rankin and Paul Cushing, not guilty."

The italicizing is ours. In view of these instructions, the suggestion that the jury might have concluded that all abortions are unlawful, and punishable as felonies, except when performed by a duly licensed surgeon, is quite unlikely. The jury were repeatedly referred to the information, which alleged that the use of the instrument was not necessary to preserve the life of said B. Price, or that of the child whereof she was pregnant.

■ The next assignment is that the phrase "common plan or scheme to perform unlawful abortions" was misleading. While the evidence discloses that appellants were not present at the time and place of the crime charged, yet if they were accessories before the fact, they were chargeable in the manner of the information by reason of the laws of this state, abolishing the distinction between an accessory before the fact, and a principal in the first and second degree. In this respect sec. 9958 N. C. L. provides as follows:

"Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall be

proceeded against and punished as such. The fact that the person aided, abetted, counselled, encouraged, hired, commanded, induced or procured, could not or did not entertain a criminal intent, shall not be a defense to any person aiding, abetting, counselling, encouraging, hiring, commanding, inducing, or procuring him."

And sec. 10869 N. C. L. provided: "No distinction shall exist between an accessory before the fact and a principal in the first and second degree in cases of felony and all persons concerned in the commission of a felony whether they directly commit the act constituting the offense, or aid and-abet in its commission, though not present, shall hereafter be prosecuted, tried and punished as principals, and no other facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal."

■■ The jury were properly instructed as to the effect of these statutes. In this connection the jury were also instructed: "You are instructed in this case that it is not necessary for the State of Nevada to prove that the defendants or either of them actually performed the crime charged in the information, in person or while present. If you find from the evidence beyond a reasonable doubt, that an unlawful abortion was performed by any person at the time, place and in the manner set forth in the information, and that the defendants, R. L. Rankin and Paul Cushing, or either of them, aided, abetted, encouraged, counseled, hired, commanded, induced or procured another to perform the unlawful abortion in pursuance to a common scheme or plan entered into by defendants, R. L. Rankin, Paul Cushing, Valentine St. John and Ruth Barnett, and the same was the natural or probable result of such common plan or scheme to perform unlawful abortions, you should find the defendants, R. L. Rankin and Paul Cushing, or either of them, guilty as charged. This is so even should you find from the evidence in this case that said defendants or either of them were not present during

the time of the actual performing of an abortion on B. Price, and that such defendants did not or could not form a criminal intent in respect to the particular abortion charged in the information. It is sufficient for you to return a verdict of guilty, that the evidence taken as a whole convinces you beyond a reasonable doubt that an unlawful abortion as charged in the information was committed at the time and in the manner set forth in the charge and that the defendants, R. L. Rankin and Paul Cushing, or either of them, aided, abetted, counseled, encouraged, hired, commanded, induced or procured the same directly or indirectly and whether present or absent at the time an unlawful abortion was performed."

We do not see wherein the instruction is misleading. It seems to be the thought of appellants that if Ruth Barnett committed an unlawful abortion as alleged in the information, the jury could have been mislead by the instruction into the belief that appellants would have been held culpable as accessories before the fact even though the scheme and plan was for the performance of lawful abortions only. The instructions of the court covered the field of principals and accessories quite thoroughly, and must be considered as a whole. The court guarded against any false impression being gained by the jury in the manner feared by appellants, in the following instruction: "You are instructed that an accused person cannot be convicted of an independent crime committed by a confederate, unless such crime took place in the execution of a common plan or scheme. If you find that Ruth Barnett's operation on Mrs. Price was an illegal abortion, but you also find that Ruth Barnett's act was not a part of a common plan or scheme previously entered into by her with Rankin and Cushing, you must find the defendants, Rankin and Cushing, not guilty."

The jury could not have been mislead in this regard.

■ The next assignment we will discuss is the refusal of the trial court to instruct the jury as to the necessity

of a guilty principal, as a prerequisite of a guilty accessory. The instruction refused is as follows: "You are instructed that, although Mrs. Barnett has been discharged as a defendant in this case, upon motion of the district attorney, you cannot convict the defendants Rankin and Cushing unless you first find that Mrs. Barnett was guilty of the offense charged in the information, and unless you further find that Rankin and Cushing aided or abetted or encouraged her in the said offense, if it was an offense."

■■ It was refused on the ground that it was not an accurate statement of the law. In this we concur and think also that it was misleading in that the jury could have gained from it the notion that because Ruth Barnett had been discharged from the information, the appellants could not be convicted; in other words, that her conviction was essential to their prosecution. This is not the law. As we have seen, under our statutes, he that aids and abets in the commission of an offense, whether present or absent, is a principal and may be prosecuted, tried and punished as such. This is a departure from the common-law procedure. At common law the conviction of the principal was essential to the prosecution of an accessory. Under the statute of some states this is still the rule. Our statutes have also abrogated the common-law rule in that respect. In the case of State v. Jones, 7 Nev. 408, it was held that under our statutes it is not essential to the conviction of accessories before the fact, that the prosecution first prove the guilt of the principal; it is only necessary in such case to show that a crime has been committed, and that defendant, if present, aided and assisted, or, if not present, advised and encouraged it. In this connection the court said: "The instruction [rejected] would seem to assume that the principal should be identified and his guilt proven; whereas it is only necessary first to prove the unlawful taking, and then that the defendants had such connection with them as would bring them within the statute."

The holding of our supreme court to that effect is recognized in 22 C. J. S., Criminal Law, sec. 105, p. 179, wherein it is said in note 59 to the text: "In Nevada, under such a statute as is contemplated by the text [statutes which abolish the distinction between principals and accessories], while the prosecution must show that a felony has been committed and that the accused instigated its commission, still it has been held not necessary to prove by whom the felony was committed." State v. Jones, supra.

 It is argued that there cannot be a guilty accessory without a guilty principal, and that the discharge of Ruth Barnett from the information was an acquittal under the statute operating as a bar to the prosecution of appellants. The first proposition is true as a matter of logic, but the latter does not follow as a matter of law. The effect of the statute was to exonerate the party discharged, but the order of court discharging her did not and could not have the effect of exonerating those the order was designed to enable her to testify against. It did not find that no crime had been committed. To attribute to it such an effect would be to charge the legislature with enacting a vain act as to any case where a principal and an accessory might be jointly accused. It would give the state a right which, if exercised, would defeat the end designed. While the state might not, in a given case, be able to prove the identity of the principal offender, that fact should not become a shield to all who may have been concerned as accessories before the fact. As stated in People v. Mangiapane, 219 Mich. 62, 188 N. W. 401, 402: "The effect of our statute is to permit the prosecution of one who aids and abets, without regard to the conviction or acquittal of one who, under the common law, would have been called the principal. That is what the statute intended to accomplish in abrogating the common-law rule." See People v. Smith, 271 Mich. 553, 260 N. W. 911.

But we are not dealing with a case of an unidentified

principal. The important fact on this phase of the instant case is as to the unlawful abortion charged in the information. We are of the opinion that there is evidence aside from the testimony of the accomplices which tends to show that Ruth Barnett committed that crime. The question of her guilt was therefore resolved against appellants by the verdict of the jury. We have examined the cases cited by them, but they were decided by courts which follow the common-law rule.

■ What we have said on this assignment also applies to the next assignment that the court erred in refusing to instruct the jury as to the legal effect of the discharge of the only principal offender. The legal effect, as we have said, was not as appellants contend, to discharge appellants. The court properly instructed the jury in the matter of Ruth Barnett's discharge as follows: "You are instructed that Ruth Barnett, upon motion of the District Attorney, has been discharged as one of the defendants in this case; and you are further instructed that her discharge is deemed an acquittal."

Her discharge had no bearing whatever upon the guilt or innocence of appellants, except insofar as her testimony may have tended to prove.

■ Appellants have assigned as error the refusal of the court to give the following instruction: "When a statute makes an offense to consist of an act combined with a particular intent, that intent is just as necessary to be proved as the act itself, and must be found by the jury as a matter of fact before the jury can find a verdict of guilty."

The proposed instruction is correct as an abstract proposition of law, but in view of the nature of this case and the instructions given, which stated the principle applicable, its refusal was not an error. We have already set out in this opinion some of these instructions and will not repeat them.

■ Appellants cite Wagner v. State, 43 Neb. 1, 61 N. W. 85, in which it was held that if a specific intent is an essential ingredient of the crime, the accessory

must have entertained such intent or known that the principle entertained it.

This principle is not applicable to the facts of this case. If such a common plan or scheme was entered into by the persons, the particular offenses alleged in the information need not have been the direct result thereof to incriminate them; it is enough if the crime alleged in the information in the ordinary course of things was the natural or probable consequence of such common plan or scheme.

■ As stated in 22 C. J. S., Criminal Laws, sec. 92, p. 164: "It is well settled, however, that he [an accessory before the fact] need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him. So also the fact that the crime is not committed in the particular way designated by the procurer or conspirator does not prevent him from being liable as an accessory before the fact, but for crimes which are the outcome of a total or substantial departure from his counsel agreement, directions, or instructions he is not liable."

■ The principle applicable is ably discussed in people v. King, 30 Cal. App. 185, 85 P.(2d) 928, 938, as follows:

"The numerous cases cited by appellants in support of the proposition that the criminal responsibility of aiders and abettors—accessories before the fact at common law—is no greater than the intent formed by them, and that this intent is limited to the particular criminal act contemplated, do not go to the point that such an accessory is not liable for all the natural and probable consequences attendant upon the commission of the contemplated act. These cases are authority only in support of the rule that one is not bound by the act of

another foreign to and different from the act counselled and advised. The guilt of an accessory in the crime actually committed, though not advised, is illustrated in the case of Regina v. Bernard, 1 F. & F., 240, 242: ' " '* * * As if A. advised B. to rob C., and in robbing him B. kills him, either upon resistance made, or to conceal the fact; or if A. solicit B. to burn the house of C., and B. does it accordingly, and the flames taking hold of the house of D., that likewise is burnt; in these cases A. is accessory to B. both in the murder of C. and in the burning of the house of D.; the events, though possibly falling out beyond his original intention, were, in the ordinary course of things, the probable consequences of what B. did under the influence and at the instigation of A.' " '

"That one is not liable who has counselled a particular criminal act, and the perpetrator has committed a different one not falling within the probable consequences of that advised, as illustrated in note 37, 16 Corpus Juris, 135, as follows: 'If one advises another to beat a man and the latter dies as the result of the beating, it is murder, and the advisor is an accessory to the murder; but if the advice is to burn a house and the person advised breaks in and commits larceny therein, but does not burn it, the adviser is not an accessory to the burglary, for that is a distinct and separate offense. (Reg. v. Henry, 9 C. & P., 309, 38 E C L 187; 4 Blackstone Comm., p. 37; 1 Hale P. C., p. 617.' "

In Workman v. State, 216 Ind. 68, 21 N. E. (2d) 712, 715, 23 N. E. (2d) 419, also cited by the state, the court said: "There can be no doubt of the general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that, if he combines and confederates with others to accomplish an illegal purpose, he is liable criminaliter for everything done by his confederates which follows incidentally in the execution of the common design, as one

of its probable and natural consequences, even though it was not intended as a part of the original design or common plan."

See 22 C. J. S., Criminal Law, sec. 87, pp. 155, 156, where this principle is also expounded.

■ Error was predicated upon the refusal of the court to charge the jury as follows: "You are instructed that if you find that Ruth Barnett performed an operation on Mrs. Price, and that such operation was necessary to preserve the life of Mrs. Price, then no crime has been committed by any person in this case, and you must find that the defendants Rankin and Cushing are 'Not Guilty.' "

The instruction was properly refused because there was no evidence tending to show that such operation was necessary to preserve the life of Mrs. Price.

We have examined all the other claims of error as to instructions given and refused and find them to be without merit, and say likewise as to the other errors claimed to have occurred at the trial.

■ It is assigned as error that the phrase "common plan or scheme to perform unlawful abortions" was prejudicial in that it stated assumed facts not in evidence.

The instruction in which the phrase complained of appears has already been set out in this opinion and we think it is a correct statement of the law. It is criticised on the ground that it was an invasion of the province of the jury in assuming that an abortion had been performed on B. Price. A reading of the entire instruction will reveal that there is no such invasion. The evidence shows without contradiction that there was an abortion performed on that person at the time and in the manner alleged in the information. This is conceded. And as previously stated, the evidence tends to show that it was an unlawful abortion. It was performed by one whom the evidence shows was an abortionist of considerable experience and who was acting with appellants and St. John in a common plan or scheme for the treatment

of women's diseases and ailments. The plan or scheme included the performance of abortions. The argument that there is no evidence whatever to show that the enterprise included the performance of unlawful abortions, does not persuade us to that belief. Our summarization of the evidence, while extensive, was not exhaustive, but we think enough appears therefrom, slight though it is, to warrant a legitimate inference that the scope of the enterprise included the performing of illegal abortions.

The margin is close to the line between evidence sufficient to support the verdict and a number of highly suspicious circumstances—so close as to make, as was said in State v. Jones, supra, a hard case. There is enough evidence, however, independently of the testimony of the accomplices to make appellants' guilt a question of fact. Our inquiry, therefore, can proceed no further. For the reasons given, a new trial was properly denied.

The judgment and order appealed from should be affirmed.

It is so ordered.