THE STATE OF NEVADA, APPELLANT, *v.*
MARY ALLISON FUCHS, RESPONDENT.

No. 4426

February 22, 1962                    368 P.2d 869

[Rehearing denied March 21, 1962]

*Roger D. Foley,* Attorney General; *John F. Mendoza,* District Attorney, Clark County; *Charles L. Garner,* Deputy District Attorney, Clark County, for Appellant.

*Tad Porter,* of Las Vegas, for Respondent.

## OPINION

By the Court, THOMPSON, J.:

After a preliminary hearing, Mary Allison Fuchs was held to answer in the district court upon the charge of

murder. She thereafter petitioned that court for a writ of habeas corpus, which was granted. The State has appealed from the order granting such writ. NRS 34.380. The sole question posed for our determination is whether there was sufficient legal evidence presented at the preliminary hearing to make it appear that a public offense had been committed, and sufficient cause to believe the accused guilty thereof. NRS 171.455; Ervin v. Leypoldt, 76 Nev. 297, 352 P.2d 718; Raggio v. Bryan, 76 Nev. 1, 348 P.2d 156; Ex parte Liotard, 47 Nev. 169, 217 P. 960, 30 A.L.R. 63; In re Kelly, 28 Nev. 491, 83 P. 223.

A review of the transcript of the preliminary hearing discloses, among other matters, that the accused, her three-year-old son and her husband, the decedent, were the only persons in the home at the time of the homicide; that there was a loaded .45 caliber revolver with a spent cartridge under the hammer near the body of the deceased; that the cause of death was a massive intra-abdominal hemorrhage from perforation of the liver by a .45 caliber bullet; that the accused told police officers that she had shot her husband because he had beaten their son and had said he would kill him. Without more, the foregoing would make it appear that a public offense had been committed and that there was sufficient cause to believe the accused guilty thereof. However, additional evidence, consisting of a written statement by the accused, was introduced by the State. The accused, respondent here, earnestly contends that such statement constituted proof by the prosecution establishing a justifiable or excusable homicide, NRS 200.170, in the defense of another, NRS 200.160; and, that having offered such proof, the State was bound by it. The statement reads:

"I, Mary Allison Fuchs, 35 years of age, residing at 5904 Gipsy Avenue, Las Vegas, Nevada, make the following statement of my own free will and accord to Officers H. Barrett and R. Burgess of the Las Vegas Police Department. No threats, duress, coercion or promises have been made to me in order for me to make this statement. I have been advised as to my

right to consult an attorney before making this statement and I realize it can be used in a Court of Law against me. I got home from work at about 4:30 p. m., February 9, 1961. We had another man living in the house with us until today when he moved out. He had all of his things packed in his car when I got home. His name is John Baczek and he is working in San Jose, California. He was ready to leave and asked if Art would be home shortly so I called the nursery to see if Art had been there to pick up our son. Mrs. Leonard answered and said he had been there a few minutes before and had picked up Greg and would home [sic] shortly. He got home about ten minutes to five. He and John talked in the living room and I went to the bedrooms to straighten up the beds. I was in the kitchen when John left. Art was out front with him and after he left Art came back into the house. He had bought Greg a sail plane and they played with it on the patio until about 6:00 p. m. John had left an old car there for Art to sell for the money he owed him. Art called two friends and asked if they knew anyone who wanted a work car. I talked to one of these person's wife, Mrs. Nabat, about a possible job I knew of that she might be interested in when he was on the phone. He also talked to Charlie Ottenheimer who asked us to come over so about 7:30 p. m., we took Greg and went over to the Fireside Inn. We visited until about 8:30 or 9:00 p. m. and had two drinks while we were there. I had had a drink earlier at home. After getting home I went in and put my mau mau [sic] on and Greg was playing with the airplane. Art had been building a model airplane in the living room so I told him, 'Now that John is out you have a room to have all your things in'. He went into the den and was looking around and then he came out with a picture which was taken about eight years ago and one manila envelope, a spiral notebook which I had started to keep a family budget in about five years ago and a white envelope. He said something like you sure as hell never did anything with this. Then I told him, 'Well, I started to'. Then he layed [sic] them down on the sink board. I told him, 'Well, Art,

pick them up and take them back to the den. We'll look at them later or tomorrow'. He took offense to this and stated, 'I'm no colored slave you can order around. I'm no ——— ——— gigolo. Just because you bring home the money doesn't mean you can order me around'. While he was saying this he broke the picture by throwing it onto the floor. I was draining the spaghetti and I told Greg to take his pajamas into our room and I would get him ready for bed, which he did. Art got very belligerent about the whole thing and started talking about things which happened ten years ago, accusing me of slighting him by not consulting him on things. I said, 'That's why when we bought this house, before I bought anything, any drapes or furniture, I consulted you'. He stood up and held up his fist and said, 'What right do you have of accusing me of saying these things when I hadn't said it', or words to that effect. He was furious. I told him that I thought he had been happy with the choice. His voice got very loud and Greg came out of the bedroom and was standing in the dining room area. Greg started crying and was very upset. This seemed to infuriate Art and he stormed out of the living room and hit Greg, knocking him against the wall and his feet came out from under him, causing him to fall and bump into a table which started to overturn. I ran and grabbed Greg with one arm and tried to steady the table with the other. I took Greg back and put him in the middle of the bed and told him to stay there. I then heard Art overturn the table which broke the glassware on top of it. I had to go to the bathroom which is inside of our room. When I was in the bathroom I heard Art getting into the linen closet and he said that he realized then that he could break all the furniture and all the things and things I liked like my records, and that he could break them all up and tear down the drapes and it wouldn't mean a thing to me but that the only way he could hurt me was by hurting Greg. He went to the sink and I guess he was washing off his hands. I was still in the bedroom and Greg seemed to be afraid to cry because of what had happened to him earlier. I had heard the water running

and by that time he was almost screaming and said something like you or Greg or I won't even be alive tomorrow and it won't take much to kill him, as he is real little. I was still in the bedroom and I reached up and got the gun. I didn't load this gun but I know that Art keeps all the hand guns loaded; not the rifles though. I walked back down the hall and went into the living room to the far end. He came in from the kitchen and he still had the towel in his hands. I said, 'You couldn't possibly mean that you would do anything to hurt Greg no matter how you feel about anything else. You possibly couldn't mean that you would hurt Greg?' I had the gun at my side but I don't think it was hidden from him. I was standing in front of him and he sort of pushed me and he said, 'I'll show you whether or not I mean it or not. I'll finish him right now'. I was still in his way and then I raised the gun and shot him. I guess I was right in front of him when I shot but I don't know for sure.

"I have read the foregoing statement consisting of almost two typewritten pages. I have initialed each page and each correction and have signed this page. It is the truth to the best of my knowledge.

"MARY ALLISON FUCHS

"Witnesses:
H. BARRETT, Sgt. LVPD
R. H. BURGESS # 6 LVPD."

Whether the State was bound by such exculpatory statement is immaterial. The justice of the peace was not. In discharging his duty, he could accord to such statement whatever credit he deemed it warranted. It was not his duty, nor was it the duty of the district court, to pass on the sufficiency of the evidence to justify conviction. Cf. Ervin v. Leypoldt, supra. The accused's explanation for the homicide, being in the nature of a defense, whether true or false, reasonable or unreasonable, is for the trier of the fact to consider at a trial. Neither a preliminary hearing, nor a hearing upon a petition for a writ of habeas corpus is designed

as a substitute for this function. Cf. Ex parte Colton, 72 Nev. 83, 295 P.2d 383.

It is our conclusion that the accused-respondent was bound over to the district court for trial as a result of a preliminary hearing at which sufficient legal evidence was presented to make it appear that a public offense had been committed as charged and that there was sufficient cause to believe her guilty thereof. Under such circumstances she was not unlawfully restrained of her liberty. Therefore it was error to grant the writ of habeas corpus which discharged the respondent from custody. Raggio v. Bryan, supra.

Reversed.

BADT, C. J., and McNAMEE, J., concur.