FRANK RALPH LaPENA AND ROSALIE MAXWELL, APPELLANTS, v. THE STATE OF NEVADA, RESPOND–ENT.

No. 8063

January 2, 1976                    544 P.2d 1187

*Goodman and Snyder,* and *Douglas G. Crosby,* of Las Vegas, for Appellants.

*Robert List,* Attorney General; *George E. Holt,* District Attorney, and *Dan M. Seaton,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, ZENOFF, J.:

Frank LaPena and Rosalie Maxwell were charged as principals in the robbery of Marvin and Hilda Krause and in the murder of Hilda Krause on January 14, 1974. That the robbery and murder occurred is not in issue. Maxwell and LaPena

appeal from orders denying their petition for habeas corpus. They contend that for lack of sufficient corroborating evidence to the testimony of accomplice Gerald Weakland, who admitted the commission of the crime, they should not be bound over for trial.

LaPena and Rosalie Maxwell apparently believed that Marvin Krause was a man who possessed substantial wealth. Evidently, Rosalie and Krause had been meeting surreptitiously for a period of time prior to the robbery and killing. Weakland testified at the preliminary hearing that he was hired by LaPena to kill Hilda Krause so that Rosalie would be in a position to enjoy Krause without interference from his wife. LaPena would profit because he was Rosalie's true lover and he would stand, he hoped, as a pecuniary beneficiary to the Krause-Maxwell relationship.

NRS 175.291(1) provides:

"A conviction shall not be had on the testimony of an accomplice unless he is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof."

Since Weakland is an accomplice we must determine what evidence is present independent of the accomplice testimony to connect LaPena and Maxwell with the crime. The necessary corroboration need not be found in a single fact or circumstance, rather several circumstances in combination may satisfy the statute. If circumstances and evidence from sources other than the testimony of the accomplice tend on the whole to connect the accused with the crime charged, it is enough. LaPena v. Sheriff, 91 Nev. 692, 541 P.2d 907 (1975); Lamb v. Bennett, 87 Nev. 89, 482 P.2d 298 (1971).

The composite of facts and circumstances as established by the testimony of many witnesses take the two accused beyond the status of mere casual association with Weakland. See Eckert v. State, 91 Nev. 183, 533 P.2d 468 (1975); Austin v. State, 87 Nev. 578, 491 P.2d 724 (1971); Ex Parte Hutchinson, 76 Nev. 478, 357 P.2d 589 (1960). From the testimony of other witnesses it is established that LaPena was not merely an acquaintance of Weakland, as we noted in LaPena v. Sheriff, supra, but one who with Maxwell had a motive to get rid of Hilda Krause and who was therefore linked inculpably to Weakland in a criminal scheme.

Among the witnesses were persons related to Weakland, brothers, sister-in-law and former wife, all of whom had been brought into contact with Frank LaPena by Weakland, as well as others. Their testimony concerned events and conversations that transpired proximately before and after the crimes were committed.

For a short period preceding the offenses, Jerry Weakland lived in the residence of his sister-in-law, Sandra. She testified to receiving phone calls from a "Frank" at her home. The telephone number she noted was traced at the preliminary hearing to Frank LaPena. She eventually was introduced to LaPena by Weakland and she knew of no other acquaintance of Jerry's who bore the same first name of "Frank."

Additionally, in the daylight hours after the crimes were committed Weakland brought a portable TV set to her home. A portable TV set was part of the loot from the robbery. She added that the TV set was quickly taken from her dwelling by Jerry's brothers and destroyed, which as they testified was because of the surveillance of Jerry by the police after January 14.

Certain jewelry was taken from the Krauses by the culprits, principally a watch and a ring. Jerry gave a friend and a brother a watch and a ring that answered the description of the Krause jewelry. Gail had been taken to Rosalie Maxwell's residence prior to the commission of the crimes by her former husband and after the crimes she was sent twice by Weakland to pick up cash from LaPena. Weakland also showed his ex-wife, Gail, $1,000 in cash in $100 bills that came suddenly into his possession at or about the time of the robbery and murder. She also saw him hide a watch and a ring a few hours after the time the crimes were committed.

Weakland testified that he borrowed his former wife's 1973 Monte Carlo automobile at 3:00 a.m., January 14. Together with Thomas Boutwell they drove to a point near the Krause residence and parked it. After gaining entrance to the house he detailed how Boutwell tied up Marvin Krause and took him to a room away from where they met Hilda Krause. Jerry then hit Marvin Krause over the head with a .38 caliber pistol rendering him unconscious. Boutwell proceeded to strip Krause of his jewelry and what little cash he found on Krause's body. At the same time Weakland took Mrs. Krause to another room, bound her arms behind her, fashioned her with a gag and hit her on the head with his fist which was covered with a black leather glove. He had obtained, prior to this event, a pair of black leather lead-filled gloves from LaPena. While she was thus unconscious,

he turned her face down, pulled her head up by the hair and cut her throat.

Boutwell was in another part of the house at the time apparently unaware of the murder. Together they carried the TV set outside to Krause's Cadillac automobile and drove to the Monte Carlo car. When they were moving the TV set into the rear portion of Gail Weakland's automobile a corner of the TV set ripped the liner of the car top. Gail testified she recalled that her car was in good shape when Jerry borrowed it but that when it was returned she noted the tear in the roof. This occurred during the morning hours following the murder.

Gail corroborated Weakland's testimony that together they went to Lake Havasu after the crimes (although she did not know that crimes had been committed) and that she was present when Weakland attempted to call LaPena long distance from their motel room, to which the motel manager also testified.

Gail testified further and variously about Weakland sending her to LaPena for money on two occasions, that she returned the black gloves to LaPena at the Hacienda Hotel under furtive circumstances and even that prior to January 14 he showed her a hand-drawn map of the Krause residence which he later destroyed in her presence.

Rosalie Maxwell admitted to a detective that she was a sexual companion to Marvin Krause while his wife was out of the city; that Krause gave her money from time to time; and that Krause was her "live one" but Frank LaPena was her true lover. The totality of the testimony and evidence are supportive of inferences that Rosalie Maxwell and LaPena sought to eliminate Hilda Krause so that Rosalie and LaPena would be in a position to enjoy Krause's wealth without Hilda's interference. For this, Weakland was to be paid $10,000 by the end of the year.

One of Weakland's brothers told of instructions from Jerry that if Jerry were ever in circumstances where he needed money, the brother was to see "Frank" and he would get some.

Additional permissible inferences can be drawn from the testimony of Bobby Webb, Mary Bordeaux and police officer Avants. LaPena v. Sheriff, supra; Goldsmith v. Sheriff, 85 Nev. 295, 454 P.2d 86 (1969). Weakland, the accomplice and coconspirator, told Webb of the contemplated robbery and indicated that a friend of his had supplied him with a map to the apartment, that he had given him information on what time

Krause was to leave the apartment and that the thing was well planned. This was before the crimes were perpetrated.

After the crimes were committed, Weakland told Webb that his friend's girl friend would marry Krause and that she would pay him the money. Finally, after the crimes, Weakland told Webb that "if the police ever ask you if you know Frank, say no"; and Weakland said, "and you know who I am talking about," to which Webb replied, "yes." Webb then identified Frank as the Frank LaPena in court.

It is permissible to infer that the individuals to whom Weakland was referring in his extra-judicial statements to Webb were LaPena and Maxwell.

Although the magistrate found Webb to be an accomplice (whether this was appropriate was not presented as an issue on appeal), Webb's testimony was corroborated by Mary Bordeaux, by Gail Weakland and by officers Avants and Lee.

Maxwell told police officers Avants and Lee of her involvement with Krause, her knowledge of his wealth, Krause's proposals of marriage and her true love for Frank LaPena. The permissible inferences from her testimony tie directly to the statements made by Weakland to Webb and support the conspiracy theory of the state.

All of the foregoing "tends to connect" LaPena and Maxwell with the crimes charged. The hearsay statements of Weakland to Webb are admissible under Goldsmith v. Sheriff, supra, and not "testimony" of an accomplice within NRS 175.291.

The witnesses who testified corroborating Weakland's testimony do not appear to have been motivated by self-serving purposes. For example, Weakland's ex-wife, Gail, had often been beaten up by him, three times severely enough to cause her to be hospitalized. The most recent such incident occurred at the time of the events surrounding the Krause murder and robbery. It is doubtful that she would shade her testimony to favor him.

Although Weakland's participation in these crimes may have warranted a more serious charge than second-degree murder, plea bargaining is permissible. Until legislatively forbidden, or otherwise, his testimony in exchange for a lesser accusation carries whatever weight a magistrate or jury want to give it. For our present purposes the evidence as related is inculpatory and corroborative.

Affirmed.

Mowbray and Thompson, JJ., concur.

GUNDERSON, C. J., with whom BATJER, J., agrees, dissenting:

Justice Batjer and I believe that the record before us lacks evidence which, in the legal sense, "corroborates" the accomplice testimony adduced against appellants LaPena and Maxwell. Accordingly, we would reverse the district court's order denying them habeas relief, and order appellants discharged unless the State, believing further evidence of a legally corroborative character to be available, should elect to re-charge them within a specified period of time.

## Prefatory Comment

To obtain evidence to charge appellants Frank LaPena and Rosalie Maxwell as principals in the robbery of Marvin and Hilda Krause, and in the capital murder of Hilda Krause, the prosecution has bargained for testimony from the admitted actual robber and killer, Gerald Weakland, and from his acknowledged accomplice Robert Webb.[1]

Although NRS 200.030(5) expressly declares the death penalty mandatory for capital murder, in an extra-statutory exercise of discretion the prosecution agreed to charge Weakland merely with second degree murder, to withhold related robbery charges, and in addition to drop other charges arising from additional, unrelated crimes. (As hereinafter noted, Weakland's accomplice, Robert Webb, struck an even better bargain.) Thus, it seems, the actual killers have been induced to identify LaPena and Maxwell as persons who instigated their own criminal acts, ostensibly so that Maxwell could marry Krause and, with her lover LaPena, enjoy Krause's money.

I will not now address numerous questions potentially concerned in such prosecutorial conduct.[2] At this time, I consider only the issue the majority treat, i.e., whether the testimony of

---

[1] The now incumbent District Attorney was not serving in that office when the bargain referred to was entered.

[2] One must, of course, note concern regarding the propriety of the prosecution's conduct, not only because it seems clearly to contravene our Legislature's mandate, but also because, in so doing, it may also violate the United States Supreme Court's edict against "wanton and freakish" applications of the death penalty. See: Furman v. Georgia, 408 U.S. 238, 310 (1972), Stewart, J., concurring. However, we need not reach such considerations; nor do I here consider whether the purchase of testimony, through a bargain so disproportionate, violates due process of law.

Weakland and Webb has been duly corroborated, as NRS 175.291 requires.

### Application of NRS 175.291; In General

Enunciating the test to be utilized in applying NRS 175.291, this court has declared, consistently with authority elsewhere:

"Under statutes such as NRS 175.291 it is commonly held that 'corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused.' Peope v. Shaw, 112 P.2d 241, 255 (Cal. 1941), and cases there cited; Cooper v. Territory, 91 P. 1032 (Okla. 1907). As the California Supreme Court said in People v. Shaw, supra, citing numerous authorities:

" 'The difficulty comes in determining what corroboration is sufficient. First, we must eliminate from the case the evidence of the accomplice, and then examine the evidence of the remaining witness or witnesses with the view to ascertain if there be inculpatory evidence,—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him.' Id., at 255; emphasis in original.

"This seems the approach the courts have uniformly taken to application of statutes like NRS 175.291; indeed, it seems the only approach available. How else may we implement the legislative edict that there must be corroborative evidence 'which *in itself*' tends to connect the defendant with the commission of the offense '*without* the aid of testimony of the accomplice'? How else may we honor the legislative mandate that 'corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof'?

"Implicitly recognizing the propriety of the afore described approach to application of NRS 175.291, this court held in Ex Parte Hutchinson, 76 Nev. 478, 357 P.2d 589 (1960), that an accomplice was not sufficiently corroborated, even to show probable cause to hold for trial, merely by showing the defendant was with the accomplice near the scene of the crime on the night it was committed, at the time the accomplice testified they committed it in concert. . . ." Austin v. State, 87 Nev. 578, 585, 491 P.2d 724, 728–729 (1971).

Having called to mind this firmly established approach which NRS 175.291 mandates, I now propose to eliminate from consideration testimony of the established accomplices and then, in

fidelity to the legislative command, determine whether any of the remaining evidence alluded to in the majority opinion constitutes "corroboration" in the legal acceptation of that term.

*Details Concerning the Crime's Commission and Circumstances*

By its express terms, NRS 175.291 does not merely mandate that "corroboration," to be legally sufficient, must in itself have independent inculpatory significance "without the aid of the testimony of the accomplice." The Legislature went on to provide, most explicitly, that "corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof." It is, of course, not for this Court to question the wisdom of this provision, which in any event has a logical basis, grounded in legal history and precedent. As this Court noted in Austin v. State: "A man who has been guilty of a crime himself will always be able to relate the facts of the case, and if the confirmation be only on the truth of that history, without identifying the person, that is really no corroboration at all." 87 Nev. at 584, n. 7, 491 P.2d at 728, quoting Lord Abinger, C. B., in R. v. Farler, 8 C. & P. 106 (1837). This court also noted "that 'ex concesso' an accomplice was concerned in the crime and [knows] all the facts . . ." Id., quoting Bushe, C. J., in R. v. Sheehan, Jebb 54, 57 (1826). Clearly, many facts which Weakland has related, possibly quite accurately, establish no more than this: a criminal's knowledge of his own crime.

For example, Weakland testified that among the items he and Boutwell took from the Krause home were a TV set, a watch and a ring. The prosecution does not suggest that either LaPena or Maxwell ever were connected to this loot in any way whatever. In fact, as the majority opinion notices, apparently Weakland turned over to a friend and to his brother—not to LaPena or Maxwell—a ring and watch answering the description of the Krause jewelry. Arguably, the fact that Weakland's friend and brother may have received stolen property would be independent evidence tending to connect them to the commission of the offense. However, neither the fact that Weakland stole the jewelry, nor the fact that Weakland delivered it to his friend and brother, tends to inculpate LaPena or Maxwell any more than it would inculpate anyone else Weakland might agree to accuse to buy his life and freedom.[3] Purely and simply, these

---

[3] Weakland testified that, ultimately, he retrieved the ring and gave it to LaPena, unlikely testimony for which, in any event, there is no confirmation whatever. It also is worth noting that, apparently contradicting Weakland, Webb testified to getting rid of evidence, by throwing "the watches and ring" into a garbage can.

are merely circumstances of the crime which, in Lord Abinger's words, do not identify the person accused at all.

Returning to the TV set, it seems from the testimony of Gail Weakland that, when Weakland borrowed her automobile on the night of the murder-robbery, the car's headliner was intact; but upon return, it was ripped. Again, this circumstance may coincide with Weakland's statement that he and Boutwell ripped the headliner when transferring the Krause TV set into Gail Weakland's car; however, it obviously lacks any independent inculpatory significance so far as LaPena and Maxwell are concerned. The prosecution does not suggest LaPena and Maxwell have been connected either to the TV set or to the rip in the headliner, in any way at all. Indeed, according to the majority's view of the facts, Weakland first took the TV set to Sandra Weakland's home—which would inculpate Sandra if anyone. Later, my brethren say, fearing that Weakland was under police surveillance, Weakland's brothers apparently took the TV from Sandra's home and destroyed it—facts which, if true, might tend to inculpate the brothers, but certainly not LaPena or Maxwell.[4]

Similarly, according to Weakland, he received from Rosalie Maxwell a hand-drawn map of streets near the Krause residence, which he thereupon copied and destroyed. In other words, Weakland says he had a map, the origin of which he and he alone attributed to LaPena and Maxwell. While Gail Weakland testified she once saw Weakland with what appeared to be a hand-drawn map, her testimony fails even to relate it to the Krause crime, and in no way whatever establishes that either LePena or Maxwell had anything to do with its origins.

### Facts Related Neither To The Crime Nor To Appellants

Of even less force to inculpate LaPena or Maxwell is Gail Weakland's testimony that, around January 2, Weakland had some $1,000 in $100 bills. Although the majority omit to mention it, Gail further testified that Weakland had said he had won the money gambling. Instead of suggesting that this explanation was suspect in any way, Gail confirmed that Weakland was indeed a heavy gambler. Thus, far from relating the money to

---

[4]As I read the record, the TV set assertedly went first to a condominium occupied by Webb, Boutwell and Mary Beth Bordeaux, on the morning of the crime. Then, as he became fearful of discovery, Weakland and his brother Leo took the TV set from the condominium, and took it to Gordon and Sandra's home. I do not recall that the record reflects destruction of the TV set; however, in any event, certainly no one contends that either of the appellants destroyed it.

LaPena or Maxwell, or to the Krause crime, it would be altogether speculative to assume from Gail Weakland's testimony that the money had a relationship to a criminal endeavor by anyone.

### Evidence of Friendship and Association

Even evidence of close association and friendship with an acknowledged wrongdoer will not corroborate his accusation. Eckert v. State, 91 Nev. 183, 533 P.2d 468 (1975); Austin v. State, 87 Nev. 578, 491 P.2d 724 (1971); Ex Parte Hutchinson, 76 Nev. 478, 357 P.2d 589 (1960).

Here, of course, it seems clear that Weakland had a friendly relationship with LaPena and was acquainted with Maxwell. It would appear, for example, that LaPena may have telephoned Weakland occasionally at the home of his sister-in-law, Sandra, with whom he was residing. If so, he did not act furtively, but left messages using his true first name, "Frank." It also appears that, at a time prior to the robbery-murder, Gail Weakland waited in the car while Weakland went briefly into Rosalie Maxwell's townhouse. What happened inside—who was there—Gail does not know. Gail also testified that on one occasion, not two as the majority state, Weakland sent her to LaPena for money: two $20 bills and one $10 bill, or a total of $50. At one time, Weakland told one of his brothers that if he needed money, he could get it from Frank. Obviously, such testimony indicates no more than association or friendship.

This is true with other aspects of the evidence. For example, it appears that, during a weekend at Lake Havasu following the murder, Weakland made two phone calls to Las Vegas—one, he says, to his mother and the other to LaPena. Assuming such a call to LaPena were independently proved, it would inculpate LaPena no more than it inculpates Weakland's mother. And obviously, not even a prosecutor could think such calls inculpatory of Maxwell.

Of course, from Gail's testimony it does appear that at a time subsequent to the murder-robbery, Weakland caused Gail to deliver a pair of weighted black leather gloves to the Hacienda Hotel, where LaPena took them from her furtively. I do not, however, perceive that this fact has been independently related to the crime for which these appellants will stand trial for their lives. In the first place, for purposes of another prosecution, the State's theory is that LaPena delivered the gloves to Weakland for use in beating the Hacienda Hotel's manager, that Weakland so used them, then caused their return. See: LaPena v. Sheriff, 91 Nev. 692, 541 P.2d 907 (1975). Thus, the State has explained the transfer of the gloves, relating them to another

totally different crime, which Weakland also committed and later attributed to LaPena. The prosecution here desires, how-·ever, to make the gloves do double evidentiary service, which it appears to me cannot be done; for dropping out Weakland's testimony, the record fails to show that either Krause was beaten, with weighted gloves or otherwise. The gloves simply are not shown, except through accomplice testimony, to have any relationship whatever to the offense here concerned. Furthermore, not only do the gloves lack independent value to connect LaPena with the offense in question; they have, moreover, not been related to Maxwell in any way.

### Testimony of Weakland's Accomplice, Webb

From the record, it appears that Robert Webb participated with Weakland in planning the murder and robbery in question, although he restricted his participation to aiding and abetting Weakland, both before and afterward. Webb assisted Weakland in procuring the participation of Boutwell, whom Webb supplied with the gloves and jacket—and, some evidence indicates, the boots also—which Boutwell used in the crimes at the Krause residence. Webb knew these items would be used in the robbery-murder, which he helped to plan. After the crimes, and knowing of them, Webb aided and abetted Weakland by secreting evidence taken from the Krause residence. Thus, under such circumstances, it is evident that the magistrate not only was correct in finding Webb an accomplice, but might have been in error if he had found anything else. See: NRS 195.020; State v. Cushing, 61 Nev. 132, 120 P.2d 208 (1941); State v. Chapman, 6 Nev. 320 (1871).[5]

---

[5]NRS 195.020 provides:

"Who are principals. *Every person concerned in the commission of a felony,* gross misdemeanor or misdemeanor, *whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent;* and *every person who, directly or indirectly, counsels,* encourages, hires, commands, *induces or otherwise procures another to commit a felony,* gross misdemeanor or misdemeanor *is a principal,* and shall be proceeded against and punished as such. . . ." Emphasis added.

In State v. Cushing, cited above, this court expressly stated that, under our statutes, "it is only necessary in such case to show that a crime has been committed, and that the defendant, if present, aided and assisted, or, if not present, advised and encouraged it." 61 Nev. at 145; 120 P.2d at 215.

The magistrate determined Webb was an accomplice, which clearly was within his province. State v. Fuchs, 78 Nev. 63, 368 P.2d 869 (1962); In Re Oxley and Mulvaney, 38 Nev. 379, 149 P. 992 (1915);

Although Webb also might have been prosecuted for capital murder, the prosecution permitted him to plead guilty to a gross misdemeanor, with a recommendation of probation, and he is now free. On his part, Webb has by his testimony undertaken to assist the prosecution in convicting LaPena and Maxwell of a capital offense. Again, I refrain from considering the Constitutional implications of this exchange, so highly favorable to Webb. I consider only whether Webb's testimony can be viewed as corroborating Weakland's.

It is true, of course, that hearsay statements of one co-conspirator to another are admissible, and may be considered as evidence under an exception to the hearsay rule once the conspiracy is proved. NRS 51.035(3)(e); Goldsmith v. Sheriff, 85 Nev. 295, 454 P.2d 86 (1969). However, if the hearsay statements of one accomplice-conspirator, such as Weakland, are only established through the testimony of a second accomplice-conspirator, such as Webb, then it is clear such statements may not be viewed as "corroborating evidence" that a third person, such as LaPena or Maxwell, is also part of the conspiracy. *Goldsmith* does not suggest otherwise; instead, it explicitly declares that, "before those hearsay statements can be considered by the magistrate it is incumbent upon him to examine all the other evidence to determine whether, aliunde, the existence of a conspiracy was established." 85 Nev. at 304; 454 P.2d at 92. As I am sure the majority know, and as Justice Traynor recognized in People v. Clapp, 151 P.2d 237 (Cal. 1944), citing numerous authorities, "the testimony of one accomplice is not corroborated by that of another." Id. at 238; in accord, State v. Banks, 486 P.2d 584 (1971); People v. Jehl, 310 P.2d 495 (Cal.App. 1957); State v. Hilbish, 59 Nev. 469, 97 P.2d 435 (1940); VII Wigmore on Evidence, § 2059 (3rd Ed. 1940). Only this fall, our court again recognized the viability of this rule. See: LaPena v. Sheriff, 91 Nev. 692, 541 P.2d 907 (1975). Thus, since the only evidence of Weakland's supposed extra-judicial statements is testimony from Webb, and since Webb's testimony like Weakland's must be eliminated from consideration when deciding whether the prosecution has satisfied NRS 175.291's requirement of corroboration, it is

Ex Parte Wm. Willoughby, 14 Nev. 451 (1880). I presume the majority do not question the foregoing authorities. We most recently recognized their force only three months ago in State v. Havas, 91 Nev. 611, 540 P.2d 1060 (1975), there invoking them against a defendant, and holding that both the district courts and this court are bound by magistrates' factual determinations.

patent that Webb's story of what Weakland said has no more significance than his direct accusation of LaPena or Maxwell would have.

### Relationship of LaPena, Maxwell, and Krause

Impermissibly, the majority opinion has drawn upon Weakland's story to establish in LaPena and Maxwell a motive to kill Mrs. Krause. Virtually none of the "facts" concerning this supposed motive find any support in the record, save through testimony of the self-acknowledged participant, Weakland.

It does appear, of course, that the Maxwell woman was a lady of doubtful morals, who admitted regarding Krause as her "live one" and LaPena as her "true lover." Physically, she accommodated Krause; monetarily, he assisted her. On its face, however, there is nothing about their symbiotic relationship, however contrary to accepted conventions, which suggests a motive to have Krause beaten and Mrs. Krause murdered.

Only through the testimony of accomplices Weakland and Webb is a somewhat unlikely motive attributed to LaPena and Maxwell. Supposedly, LaPena and Maxwell believed Krause was quite wealthy, and decided killing Mrs. Krause would set in motion a house-that-Jack built chain of events enabling them to enjoy more of Krause's money than before. According to the story the prosecution elicited by allowing life and freedom to the two acknowledged participants, Weakland and Webb, LaPena believed that if he had Mrs. Krause killed, Krause would then marry Maxwell; that Maxwell could then induce Krause to supply her greater sums of money; and that he, LaPena, would then share the increased take. Unlike the situation revealed in LaPena v. Sheriff, supra, however, nothing tending independently to establish this motive appears in the record.

### Summary

I recognize, of course, that several items of evidence, not by themselves inculpatory, may in combination independently establish facts constituting legal corroboration. Cf. LaPena v. Sheriff, cited above. I also recognize that several items of evidence, by themselves only remotely inculpatory, may in their totality rise to the dignity of legal corroboration. Cf. People v. Trujillo, 194 P.2d 681 (Cal. 1948). I further recognize, however, that nothing plus nothing plus nothing is nothing.

As my brother Zenoff said, speaking for a unanimous court in Eckert v. State, 91 Nev. 183, 186, 533 P.2d 468, 471 (1975): "Evidence to corroborate accomplice testimony does

not suffice if it merely casts grave suspicion on the defendant." And as Lord Abinger has said: "It is a practice which deserves all the reverence of the law, that judges have uniformly told juries that they ought not to pay any respect to the testimony of an accomplice unless the accomplice is corroborated in some material particular. . . . The danger is that when a man is fixed, and knows that his own guilt is detected, he purchases immunity by falsely accusing others." R. v. Farler, 8 C. & P. 106 (1837).

I suggest that Lord Abinger's observation is apposite, not just as to those who are clearly "fixed," such as Weakland and Webb, but also to persons like Gail Weakland and Mary Bordeaux whose proximity and possible complicity in the crime is manifest, but whose guilt is not certain. I do not, of course, suggest that these women necessarily were accomplices in the legal sense. Since their complicity is not now definitely established, that will be a question of fact to be determined at trial. Cf. Austin v. State, 87 Nev. 578, 591 P.2d 724 (1971).

For present purposes, I presume, despite the women's obvious involvement with Weakland and Webb in events of the murder-robbery and ensuing efforts to escape justice, that Gail Weakland and Mary Bordeaux did not know a murder was to be committed until after it occurred.[6] I do, however, challenge the majority's dicta that there is no reason to question Gail Weakland's veracity. She and the Bordeaux woman have the same reason as Weakland and Webb have to testify as the prosecution desires. Beyond this, as a matter of logic, I question that Weakland's frequent beating and hospitalization of Gail Weakland makes it "doubtful that she would shade her testimony to favor him." I note that, after the mentioned beatings, Gail nonetheless let Weakland utilize her car on the night of the murder-robbery, and left town with him afterward.

Even fully crediting those not definitely shown to be accomplices, much of the record consists of testimony which proves only that Weakland is able to relate, with some measure of accuracy, details of his own vicious crime. The rest of the ostensible corroboration presented by the State, in itself,

---

[6]I note, however, that at least the Bordeaux woman—who was with Weakland and Webb immediately before the murder-robbery, received some of the loot, and helped destroy evidence afterward—has expressly been promised total immunity to induce her testimony against LaPena and Maxwell. Apparently, tacitly or otherwise, the prosecution also is committed not to prosecute the Weakland woman, who supplied the car used for the murder-robbery, and left with Weakland for Lake Havasu when he became fearful of discovery.

achieves no more than to prove, redundantly, that LaPena and Weakland were friends or associates. Ignoring Weakland's testimony, the testimony of one Fish (which the magistrate rejected as unworthy of belief), and the testimony of witness Webb (whom the magistrate found as a fact to be an accomplice), I therefore think the record shows only that LaPena and Maxwell are amoral persons, who consort with their own kind, including persons like Weakland.

LaPena, a hotel bell captain, has lived with Maxwell, who apparently has slept with Krause and taken as much of his money as she could get. In themselves, however, these facts suggest no reason for either of them to pay Weakland to rob Krause and murder his wife. It does appear that, around the time of the Krause murder, certain weighted black gloves passed between Weakland and LaPena; however, except through the testimony of Weakland and Webb, those gloves cannot be associated with the crimes here concerned. It is, in fact, the prosecution's theory that the gloves in question were particularly related to a different crime, which is concerned in another case before us. In the instant case, the record does not show that either Marvin or Hilda Krause was beaten, or that any plan ever existed that such would be done.

Had the magistrate not found Fish's testimony incredible, had he not determined Webb was an accomplice, and had the prosecution proved, independently of accomplice testimony, that appellants paid Weakland a large sum of money (as the prosecution tried and failed to do), then of course a substantially different question might be presented.

It seems clear that, upon the present record, by virtue of NRS 175.291, there is insufficient evidence to hold appellants to answer for the crimes with which they stand charged in this case. Thus, the order denying habeas corpus should be reversed. As to such charges, appellants should stand discharged unless the State, believing further corroborative evidence to be available, should elect to re-charge them within a specified period of time.