IN THE MATTER OF THE APPLICATION OF DUDLEY KLINE FOR A WRIT OF HABEAS CORPUS.

STATE OF NEVADA, APPELLANT, *v.* DUDLEY KLINE, RESPONDENT.

No. 3832

April 13, 1955.                                   282 P.2d 367.

*W. T. Mathews*, Attorney General, Carson City and *F. Grant Sawyer*, District Attorney, Elko, for Appellant.

*Sinai & Sinai*, of Reno, and *Keith Williams*, Elko, for Respondent.

## O P I N I O N

By the Court, BADT, J.:

This is an appeal by the state from a judgment granting Dudley Kline, the respondent, a writ of habeas corpus and discharging him from custody after he had

been held for trial pursuant to a hearing before a committing magistrate charging him with the crime of extortion. The only question we are called on to decide is whether it was error for the district court to hold that there was not "sufficient cause to believe the defendant guilty" of the offense that had been committed. Sec. 10785, N.C.L. 1929. Narrowed still further, was it error for the district court to hold that the inference drawn by the magistrate that the defendant was connected with the crime was not reasonably drawn or deduced from the facts proved. A careful examination of the facts convinces us that the total failure of the state to connect respondent with the principal who perpetrated the crime of extortion left the magistrate's inference without any reasonable support, and justified respondent's discharge on habeas corpus by the district judge.

The Nevada State Tax Commission, in addition to other duties and functions, collects taxes levied against gambling licensees and regulates gambling activities. The head of this operation is the secretary and executive officer of the commission, who is the superior of the supervisor of the gambling license division. The supervisor is superior to certain permanent personnel, who in turn supervise temporary personnel employed from time to time as undercover men to travel about the state, visit the various gambling casinos, watch the games, engage from time to time in the play and report to their immediate superior (the field assistant or field supervisor) any cheating or improper practices of the casinos or their "dealers." If the undercover agent finds tangible evidence of cheating, such as marked cards or crooked dice or if he finds intangible evidence of cheating such as, in a twenty-one game, "peeking" at the cards in the deck from which the dealer is dealing or (generally in connection with peeking) "second carding" (sliding the top card back and dealing the second card), he would report to the field assistant or field supervisor. If tangible evidence is discovered the field assistant or

supervisor immediately takes it into his possession. If intangible evidence is reported, a second observation is sought by a different undercover man and if the second observation also indicates such cheating, appropriate action is taken by the commission, usually by way of an order to the licensee to show cause why his license should not be revoked. The fact that the employment of undercover men is only temporary at once becomes clear. In time such undercover men would become known to the casino operators. The facts in the present case involve the operation of the twenty-one game only, and we have no concern with other gambling games operated by the gambling casinos.[1]

Leo Quilici, a resident of Wells, Elko County, Nevada, since 1911, had been in the bar, hotel and casino business since that date. Prior to October, 1952, he had employed his son Joe in various capacities, including that of dealer of a twenty-one game. In 1951 Joe had been caught cheating by the commission and Leo, upon receiving notice from the commission, had voluntarily surrendered his gambling license at El Rancho Hotel, which was closed for a number of months thereafter. On October 18, 1952 Joe was managing El Rancho Hotel for his father Leo Quilici and was "dealing twenty-one" about six or seven o'clock that evening when one John Galloway entered the premises and played for awhile, betting 50 cents a card, and asked some questions concerning the danger that his radiator might freeze, the distance to Sacramento, etc. to give the impression that he was a tourist. Joe cheated by peeking and second carding. Galloway left for ten or fifteen minutes and returned, followed by two men (neither of whom was Kline) who went to the bar and had a drink. A friend or acquaintance of Joe's, one Al Christy, came in a few minutes later, stood behind Galloway and pointed to him indicating to Joe that Galloway was with the tax commission.

---

[1] Faro, monte, roulette, keno, fan-tan, black jack, seven-and-a-half, big injun, klondyke, craps, etc. See Dunn v. Tax Commission, 67 Nev. 173, 216 P.2d 985.

Joe desisted from his cheating and Galloway left some ten or fifteen minutes later, followed by the two men at the bar. Joe observed them walk across the street and apparently confer for a few moments and then separate. Part of the twenty-one dealing was by Joe and some of the hands were dealt by another dealer, one Al Hobbs. Christy, who Joe thought had come in especially to warn him, was also a dealer, though in another club. Joe told his father what had occurred and came back and closed up the game.

Galloway was not employed by the commission in any capacity and had never been so employed. At the time, however, Sheldon John Moore, an undercover man employed by the commission, was in Elko County operating under the supervision of the respondent Kline. Moore was accompanied by his wife who accompanied him into the casinos, thus strengthening his appearance of being a tourist. Neither Kline nor Moore observed any cheating at El Rancho on October 18, 1952. Kline did personally observe two cheating incidents that day in other establishments.

Leo Quilici had known respondent for some five years in connection with gambling matters and as an employee of the Nevada State Tax Commission. He testified that about one thirty on the afternoon following the incident above described Kline came into the Bull's Head Bar, which was another bar, hotel and casino operated by Leo Quilici, stated he wanted to see Leo, that they went upstairs to the dance hall where Kline inquired who the twenty-one dealer was and that Leo explained that it was his son. Leo then quoted Kline as saying: "Last night he got caught cheating from the Nevada State Tax Commission man," and Leo said, "Well, that makes the second time." Kline had a pencil and a book or piece of paper in his hand during the conversation. Leo testified that Kline in leaving said that he might be able to help him, and he then described the following. About two hours later Galloway came into the Bull's Head Bar and Joe Quilici came in about the same time and secretly

told Leo that Galloway was the man who had been in El Rancho the night before. Galloway wanted to talk to Leo and they went upstairs to the dance hall. Leo testifies that Galloway said, after identifying the twenty-one dealer as Leo's son Joe: "I am the Nevada State Tax Commission man and I caught him cheating last night," and that Leo again stated: "That makes the second time." Leo then testifies that Galloway said: "If you want to fix the thing up, he says, you have got a chance, and I asked him how much the damage; he says it is $3,000, and he says I got to make a split. And so I says all right, and I says I will go down and get the money." He then got the $3,000 from his business and paid it to Galloway.

Robbins Cahill, secretary and executive officer of the Nevada State Tax Commission and who had been employed by the commission since January 1, 1945, with the position of executive officer since 1948, testified at length concerning the operation of the commission, the duties of Mr. Gallagher as supervisor of the gambling division, the employment of the permanent personnel, including Kline as field assistant, and the supervision of undercover men by Kline. Among other things he testified to the rules of the commission requiring written reports of all violations and of all observations of cheating and the constant meetings throughout the year attended by Mr. Cahill, Mr. Gallagher and members of the permanent personnel in which gambling operations throughout the state were very generally discussed. He stressed the rule that a proprietor of an establishment in which an observation of cheating had been made was not to be approached. Ordinarily he was approached only from the office of the commission by some one designated by Mr. Cahill and generally upon the issuance of a show cause order. The policy of the commission would have precluded Kline from the approach to Leo Quilici as testified to by Leo and would have required a report to the commission of the incident. Kline did not report

it in writing nor did he mention it in any of a number of "skull" sessions held with Cahill and Galloway later in the year. Gallagher testified along the same lines and placed Kline in the area in supervision of undercover man Sheldon J. Moore at the time of these occurrences. Moore testified to conferences with Kline on October 18, of Moore's observation of three other places, but not El Rancho, suspected of cheating. These conferences included a continuous period from 5: 30 p. m. to 11: 15 p. m. on October 18, 1952. As this included the period in which Galloway was playing twenty-one at Joe's table, the particular cheating incident could not have been observed directly either by Kline or Moore. However there was present in Wells during that day a man by the name of Carol Sweringen who at various times, both before and after the incident involved, had been employed by the tax commission as an undercover man.

It becomes necessary at this point to observe that this was a second preliminary hearing. It was, as noted, held May 27, 1954. The first preliminary hearing was held March 18, 1954 on a charge of extortion against both Kline and Galloway, resulting in an order by the magistrate that both defendants be held to answer. Thereafter, on April 16, 1954, Kline was discharged on habeas corpus by order of Honorable Taylor H. Wines in the same district court. It is important to note the grounds of Kline's discharge by Judge Wines in the written opinion filed by him. After noting that under sec. 11394, N.C.L. 1929, a petitioner may be released on habeas corpus when he "has been committed on a criminal charge without reasonable or probable cause," and that under sec. 10785, N.C.L. 1929, he may be held to answer only if it appears that a public offense has been committed "and there is sufficient cause to believe the defendant guilty thereof," the learned district judge recognized that the magistrate was not bound by the rule of reasonable doubt but might hold the defendant though the evidence would not support a verdict of

guilty. Citing In re Kelly, 28 Nev. 491, 83 P. 223; Ex parte Williams and Lathrop, 39 Nev. 440, 159 P. 518; Ex parte Oxley and Mulvaney, 38 Nev. 379, 380, 149 P. 992; Ex parte Bowman, 38 Nev. 484, 151 P. 517; Ex parte Liotard, 47 Nev. 169, 217 P. 960, 30 A.L.R. 63; and Ex parte Molino, 39 Nev. 360, 157 P. 1012, he stated the rule: "Sufficient or probable cause has been defined as meaning that there shall be more evidence for than against, or, supported by evidence which inclines the mind to believe, yet, leaves room for doubt; or, a state of facts which would lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion." Referring to secs. 9957–9960, N.C.L. 1929, inclusive, he properly found that Kline had been charged as a principal and based his order of discharge upon the absence of any proof of concert between Kline and Galloway. He rejected the state's contention that the evidence showed that Kline displayed a secret and special knowledge that he could have obtained only from Galloway, saying: "The evidence does not show this. At least two other persons (dealers) were aware of the impression made by John Galloway on the evening of October 18, 1952." There was of course Al Hobbs, Joe Quilici's co-dealer. There was Al Christy, a dealer from another casino, who came in and warned Joe. There were the two men who followed Galloway into El Rancho on his second appearance there. In the background was Sweringen, employed from time to time by the commission as an undercover man. And there was always the "grapevine."

Some forty-one days after the discharge of Kline by Judge Wines on habeas corpus, namely, on May 27, 1954, the second preliminary hearing was held, on the charge against Kline alone. The charge was that Kline on the day in question "did extort and gain money in the sum of $3,000 from one Leo Quilici by means of threatening to accuse Joe Quilici, the son of Leo Quilici, of a crime, to wit: the dealing of a cheating or thieving

game pursuant to N.C.L., sec. 3302.05, 1931–41 Supp."
At this second hearing Cahill and Moore, who had not
testified at the first preliminary hearing, were witnesses.
Their testimony has already been referred to. At such
second preliminary hearing before the same magistrate,
in answer to an objection to a question to Joe Quilici
asking him to describe his first encounter with Gallo-
way, the district attorney said: "* * * now, if you
will recall, referring to the last hearing, the objection
was raised that no link between the two parties [Kline
and Galloway] was shown * * *." That indeed was
the basis of Judge Wines' discharge of Kline. It must
have been clear to the state that in that forty-one day
period (or possibly in a longer period if additional time
was necessary) the required essential additional evi-
dence necessary to satisfy Judge Wines (and nothing in
the record indicates that Judge Wines did not then con-
template sitting at any subsequent habeas corpus hear-
ing) was proof of a connection between Kline and
Galloway. Kline had been in the employ of the commis-
sion for some five years, during all of which period
not only Leo Quilici but undoubtedly other operators
and dealers in other casinos in the state knew him. Lines
of investigation must certainly have been open to the
state to discover the possibility of any connection
between Kline and Galloway. That investigations were
carried on is apparent. It was shown that Kline and
Moore were registered together in a motel at Wells;
that Galloway, Sweringen and one Garner were regis-
tered together at a motel in Elko. Many other details
were elicited, but nothing to indicate any meeting
whether open or clandestine between the two men or
indicating that the two had ever met or ever knew each
other or knew of the other's existence.

It was under such situation in the habeas corpus hear-
ing before Judge Harold O. Taber, following the second
preliminary hearing, that Judge Taber said concisely
and briefly: "The court has carefully reviewed the

transcript of the evidence produced at the [second] preliminary hearing. Liberty is too precious to require a person to stand trial on such a meager showing. What was said by Judge Wines in his opinion granting the first writ of habeas corpus applies with equal force here. The writ is made permanent and petitioner's bond is discharged."

The state remarks in its brief: "It seems elemental that an accessory before the fact [who, under our statute, becomes a principal] in a case such as this, must know the plan of the person actually intending to perpetrate the crime and knowing of such intent must himself intend to aid or abet, prescribe, hire or command the actual perpetration." Such knowledge of Galloway's plan and such intent to aid and abet the perpetration of the crime is to be inferred, then argues the state, as follows:

1. Kline's approaching of Leo Quilici, contrary to specific instructions and the policy of the tax commission, carries the inference that the purpose was to lay the foundation for Galloway's intended extortion.

2. Kline's statement to Leo Quilici that the latter's son had been caught cheating "from the Nevada Tax Commission man" carries the inference that this was to lay the foundation for Galloway's demand.

3. Kline's display of pencil and paper while talking to Leo Quilici carries the inference that thereby he was conveying the fact that the situation was grave and that Kline's approach was official.

4. Kline's statement to Leo Quilici that he could perhaps help him bears the inference that this was an offer to conceal and suppress harmful evidence officially acquired.

5. Kline's failure to make a written report or to report the incident verbally in later discussions carries the inference that his silence was the consideration for the money extorted from Quilici. The foregoing propositions are propounded by the state in the form of rhetorical questions and we have supplied the answers implied

by the state. But to make each of the foregoing inferences complete, a further reasonable inference necessarily to be drawn by the magistrate must be added to each of the foregoing, namely, "that this was pursuant to an understanding, a prearrangement, a conspiracy, a plan, entered into with Galloway, that the latter would actually extort the money from Quilici and divide it with Kline." It was the lack of this that was the basis of both Judge Wines' and Judge Taber's order of discharge.

The state emphasizes that Leo Quilici's testimony as to Kline's approach and as to Galloway's approach showed such a similarity in the two approaches that they must have been the result of agreed action. According to Quilici, Kline asked who the twenty-one dealer was and when Quilici explained that there were two, Kline identified the one in question as the "light complected young man," whereupon Leo said that that must be his son. Almost the same conversation occurred when Galloway approached Leo. It is also contended by the state that because Leo testified that Kline told him "Joe was caught cheating *a* tax commission man," and Galloway subsequently told him, "I am *the* tax commission man who caught Joe cheating," the inference of a conspiracy between Kline and Galloway becomes clear. This court would have to strain for implied meanings and imputations to say that the two learned district judges were compelled to confirm the magistrate's inference of prior meetings and plottings by Kline and Galloway because of the use of the articles "a" and "the" and the descriptive words, "a light complected young man" as reported by Leo to have been used, respectively, by Kline and Galloway. It must have been obvious to both district judges, not only that Leo Quilici's English was broken, but that his English vocabulary was greatly limited, and that nowhere in his testimony was he pinned down to a recital of the exact words used by Kline or by Galloway.

We may concede that justification for holding Kline

to answer could be the result of inferences properly drawn from facts proved. Although added to the *Civil Practice Act* by the legislature, Stats. 1931, Chap. 50, p. 59, N.C.L.1931–1941 Supp., sec. 9047.02, the definition there given of an inference may well be considered. "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." This is then distinguished from a presumption which is a deduction which the law expressly directs to be made from particular facts. Such inference must be a *logical* conclusion or deduction from the given data. Webster's New International Dictionary. Conceding that it is not essential that the inference drawn must be a necessary inference, it still remains that the inference must be reasonable. Commonwealth v. Merrick, 255 Mass. 510, 152 N.E. 377. But if unreasonable or too remote the inference is not warranted. Commonwealth v. Asherowski, 196 Mass. 342, 82 N.E. 13.

In our opinion there was no error in the conclusion of the district court that Kline had been held to answer without reasonable or probable cause or in the order discharging him from custody by reason thereof.

Respondent raises other questions against the state's appeal, but since the judgment must be affirmed for the reasons stated, it is unnecessary to discuss such questions.

The judgment is affirmed.

MERRILL, C. J., and EATHER, J., concur.