DAVID MARTIN GOLDSMITH, Appellant, *v.* SHERIFF
OF LYON COUNTY, NEVADA, Respondent.

No. 5703

May 2, 1969                                    454 P.2d 86

*Goldwater, Taber, Hill & Mortimer,* and *Robert E. Rose,*
of Reno, for Appellant.

*Harvey Dickerson,* Attorney General, *John E. Stone,* Dis-
trict Attorney, for Respondent.

## OPINION

By the Court, BATJER, J.:

This is an appeal by the petitioner, David Goldsmith, from an order of the district court denying his application for a writ of habeas corpus. The following facts are pertinent on this appeal:

On January 17, 1968, a criminal complaint was filed charging Goldsmith with the murders of Robert Stucker and Larry Olinger. Shortly thereafter he was arrested in the state of Wyoming and subsequently extradited to the State of Nevada. On May 16 and 17, 1968, a preliminary examination was held to determine whether the crime of murder had been committed against Robert Stucker and Larry Olinger, and whether there was sufficient cause to believe that Goldsmith was guilty thereof.

There was well documented evidence in the record that Robert Stucker and Larry Olinger were murdered. The appellant does not here controvert that evidence.

Some of the evidence presented at that hearing which implicated Goldsmith with the murders was the testimony of Gernot Mattheis and Bonny LeMire concerning what they were told by Glenn Lucas and Ted Linn. Along with Goldsmith, Robert Lindblad, Glenn Lucas and Ted Linn are also charged with the murders. The appellant objected to the testimony of Mattheis and LeMire, and his objections were overruled by the magistrate.

Mattheis testified that on or about August 22, 1967, the following statement was made to him by Linn:

"And he said, 'Well, we had to kill a couple of guys and bullets were flying around the car and one creased Glenn Lucas in the back of his head and another one almost hit me and went in the dashboard of the car right next to the radio.' "

Mattheis further testified that Linn told him that the two men they had killed were Larry Olinger and Robert Stucker:

"And he said, 'Well Dave Goldsmith asked me to find somebody to have them killed. And I found Lindblad and Lucas to do it. But,' he said, 'the whole deal was a failure from the beginning.' "

On September 10, 1967, Mattheis was in a plane traveling from Salt Lake City, Utah, to Jackson Hole, Wyoming, with Lucas and Linn when Lucas told him that "I done a job for him (David Goldsmith) and he never paid me for it and I am going to go up there and kill him."

Later that same day Linn, Lucas and Mattheis attended a cocktail party in Jackson Hole, Wyoming, at the house owned by one Jan Carr. At this party Lucas related to Mattheis how Linn, Lindblad and he had killed Larry Olinger and Robert Stucker. Mattheis further testified:

". . . Later, when we got back from the party, we stopped back at Mr. Linn's house and we had something to eat, and Mr. Lucas said, 'That Dave, he was standing right there by the fireplace when we made that deal and,' he said, 'he hasn't come up with any money yet and I am going to kill him.' "

Linn told Mattheis of a conversation he had with Glenn Lucas on or about December 20, 1967. Mattheis testified:

"Well, Mr. Lucas had just called up and said he was tired of pussyfooting around with Dave Goldsmith and Ted Linn. He said he thinks they are splitting up the money between themselves and he is not getting any of it and he is going to come up and kill Dave Goldsmith, and Ted Linn too if he

had to." Linn also stated to Mattheis that Goldsmith was to get this money from an insurance policy.

LeMire testified that she had two conversations with Linn. During the first conversation she stated:

". . . He told me that he was expecting some money from David Goldsmith."

She further testified that with reference to Glenn Lucas:

". . . He said that Glenn would get part of this money when he received it."

She said that during her second conversation with Linn that:

"Ted told me that Glenn threatened to kill Dave if he didn't pay off. And he said he was very worried about it."

H. L. Jensen, manager of the R. J. Bar in Jackson, Wyoming, testified that Goldsmith and the other co-defendants, as well as the victims all patronized his bar in the summer of 1967, and that Linn and Goldsmith met there in the fall of 1967. He specifically testified that at one time in the month of July 1967, Lucas, Linn and Goldsmith were all in his place of business at the same time, although Lucas was not seated with the other two.

Floyd R. King, an attorney at law from the state of Wyoming, testified that he was the president of a corporation known as Alpine Investments, Inc., and that David Goldsmith and his wife, as joint tenants, owned 2,000 shares of stock; Robert Stucker and his wife, as joint tenants, owned 2,000 shares of stock; and Larry Olinger and his wife, as joint tenants, owned 2,000 shares of the stock. The appellant objected when King started to testify about the insurance policies on the deceased shareholders. The objection was overruled and the witness stated that the corporation had collected $93,-074.50 in insurance on the life of Robert Stucker and $98,-968.39 on the life of Larry Olinger. He further testified that the financial condition of the corporation had greatly improved after receipt of the insurance, and that they were able to make distribution of $15,000 to Bette Stucker, $5,000 to Mary Ann Olinger and $1,500 to David Goldsmith.

Raymond E. Roberts, of Carson City, Nevada, a special investigator from the office of the Attorney General of the State of Nevada, testified that on November 3, 1967, in his presence and in the presence of Goldsmith and Sheriff George Allen, a Lieutenant Langford of the Wyoming highway patrol said: "Well, Dave, you told me that you would get all the money" to which Goldsmith replied: "Well, at that time I

understood I was, but it goes into the corporation, I understand now."

Over the objection of Goldsmith, Fay Stucker, the father of Robert Stucker, deceased, was allowed to testify to conversations he had on or about September 8th or 9th, 1967, with Goldsmith, when the appellant asked the witness to phone Bette Stucker and advise her that he was coming out (from Moline, Illinois) and for them not to be angry at him or in any way perturbed or question any of his actions or his conversation of any type, and he further requested that she call his (Goldsmith's) wife and that the witness make the call after Goldsmith boarded the plane.

Fay Stucker further testified that he saw Goldsmith on November 5, 1967, the day before Robert Stucker's funeral. On November 5, 1967, he met Goldsmith and Jim Mercill at the funeral parlor and that they were each carrying a gun in their waistbands. When he asked Goldsmith the reason, Mercill, in the presence of Goldsmith, stated that Goldsmith's life was in danger and that he, Mercill, was going to stand by up around the door because they were expecting trouble. The witness further testified that later that evening he observed Goldsmith apparently weeping and mumbling, "I'll kill them, I'll kill them, I'll kill them." When the witness asked, "Who are you going to kill?" Goldsmith mentioned the name of Linn.

After the funeral the witness had another meeting with Goldsmith. Bette Stucker and Jim Mercill were also present. At that time the witness again discussed the guns and again Goldsmith expressed fear for his life, and the witness said, "Well, Dave, who are you particularly—who do you think is going to come out here and get you? This is—the authorities haven't been notified. Carrying guns in the State of Illinois is definitely against the law." To the question, Goldsmith mentioned the names of Linn and Bailey or Lucas and Bailey. The witness also asked Goldsmith about the $600 he had sent to Linn and why it hadn't been mentioned before. To that question Goldsmith responded: "Well, because I didn't want you to get mad at me."

On August 26, 1967, Linn contacted Bette Stucker at her trailer and asked for Goldsmith's phone number in Moline, Illinois, and in her presence he made the phone call and advised Goldsmith that he was calling from her trailer and asked for $1,000. When Goldsmith arrived in Jackson, Wyoming, on September 11, 1967, he contacted Bette Stucker and told her he wanted to get "close" to Linn because he thought

Linn could tell them something about Bob (Stucker) and Larry (Olinger). Shortly thereafter Goldsmith called Linn from her trailer and agreed to meet him at the R. J. Bar.

On or about October 10, 1967, Goldsmith brought a girl by the name of Lori Lynn from Moline, Illinois, introduced her to Bette Stucker and told Bette in Lori's presence that he would give Lori $5,000 to get close to Ted (Linn) and get any information she could concerning Bob (Stucker) and Larry (Olinger) as to where they were or what Ted knew.

A few days later Goldsmith picked up Bette Stucker and they went to the Wort Hotel in Jackson, Wyoming, and shortly after they arrived Linn and Lucas walked in and walked over to their table. Linn wrote out a check for Goldsmith and delivered it to him, then they sat down at the next table. Goldsmith introduced Lucas to Bette Stucker as "Danny." That night she talked to Goldsmith and he told her he had gone to Linn's house with Linn and Lucas. When she asked why Lucas was introduced as "Danny", Goldsmith said, "Well, he didn't want you to know he was—or; didn't want anybody in town to know it was him." At that time Goldsmith also told her that Linn and Lucas wanted a meeting with both of them and Tom Williamson to clear up rumors about the disappearance of Bob (Stucker) and Larry (Olinger) and that Lucas was denying any connection with it. Bette Stucker met with Lucas, Linn and Goldsmith at the Wort Hotel. Williamson didn't show up so the meeting broke up before anything of significance was said.

On November 26th or 27th, 1967, Goldsmith again contacted Bette Stucker and suggested to her that they meet with Ted Linn and go over a gold mining deal in which he wanted them to invest $100,000. At first she flatly refused, but Goldsmith insisted that they should at least sit down and hear what Linn had to say, and the meeting was then set up. In the meantime she contacted Lieutenant Langford and Sheriff Allen and one-half hour before the meeting was to take place Goldsmith called and told her that Linn had decided to have it at another time.

There was no evidence presented at the preliminary examination to establish that Goldsmith made any admission or confession concerning the murders of Robert Stucker and Larry Olinger.

On May 28, 1968, an order of commitment was entered directing the sheriff of Lyon County to hold Goldsmith to answer upon the charge of murder. On the same date the

information charging Goldsmith with the murders was filed. On June 25, 1968, a petition for a writ of habeas corpus was filed on behalf of Goldsmith, and subsequently the district court directed the writ to the sheriff of Lyon County. The sheriff made his return to the district court, and a hearing on the application for the writ was held on July 1, 1968. After the hearing the district court entered its order denying the appellant's application for the writ of habeas corpus.

The appellant contends that the district court was in error in denying the appellant's application for a writ of habeas corpus because there was no legally competent evidence presented at the preliminary hearing to establish probable cause to believe that the appellant committed the crime of murder. We disagree.

In determining whether the state has established prima facie evidence of a conspiracy outside the extra-judicial hearsay statements of the co-conspirators, we view the testimony concerning the meeting proposed by Goldsmith on November 27, 1967 with Ted Linn and Bette Stucker to discuss the gold mining deal, as most significant.

It is to be noted that the meeting was to occur some twenty-two days after the Robert Stucker funeral when Goldsmith and Mercill were wearing guns for protection against "Linn and Bailey, or Lucas and Bailey," and at a time when Goldsmith had emotionally told Fay Stucker that he was going to kill Ted Linn. It was only a month and a half after he had offered Lori Lynn $5,000 to "get close" to Ted Linn and slightly more than a month after he had met with Linn and Lucas at the Wort Hotel in Jackson, Wyoming, and had introduced Lucas to Bette Stucker as "Danny." At that same time Goldsmith had made a special effort to have Bette Stucker present when Linn gave him a check for $600. And it was only a short period of time after Lieutenant Langford had stated, in the presence of Raymond E. Roberts and Sheriff Allen: "Well, Dave, you told me that you would get all the money." To which Goldsmith replied: "Well, at that time I understood I was, but it goes into the corporation, I understand now."

From the testimony of the witnesses outside the extra-judicial hearsay statements of the co-conspirators, the magistrate was entitled to draw the following inferences:

(1) That Goldsmith was closely acquainted with Linn and had more than a casual acquaintance with Lucas, and that they were holding meetings in person and by phone before and after the murders.

(2) That at the time of the violent deaths of Robert Stucker and Larry Olinger, Goldsmith was under the impression that he would receive all the insurance money.

(3) That the good will of Bette Stucker was necessary because she was the key to the insurance money and a special effort was made to allay her suspicions and gain her confidence by having her present when the $600 check was delivered by Linn to Goldsmith.

(4) That the only way Goldsmith was going to get the insurance money and pay off his "obligations" was to persuade Bette Stucker to invest in Ted Linn's gold mining deal.

A further permissible inference was available to the magistrate, not from the testimony of Gernot Mattheis, but from the fact that the extra-judicial hearsay statements were made in his presence so he would carry the "message" to Goldsmith.

These permissible inferences together with the direct evidence that Ted Linn, Goldsmith's close acquaintance, and the man with whom Goldsmith wanted Bette Stucker to consider investing $100,000 on a gold mining deal, was seen leaving the Continental Motel Lounge in Reno, Nevada, with Robert Stucker and Larry Olinger on the evening of their disappearance were ample grounds for the magistrate to find prima facie evidence that Goldsmith was a party to a conspiracy to collect insurance, and that the deaths of Robert Stucker and Larry Olinger were necessary to obtain the insurance proceeds. NRS 52.020; NRS 52.040; Ex parte Kline, 71 Nev. 124, 282 P.2d 367 (1955).

After a prima facie conspiracy was established the admissible hearsay testimony of Gernot Mattheis and Bonny LeMire were sufficient to support the finding by the magistrate that there was probable cause to believe that the offense of murder has been committed and that the appellant had committed it as a principal under NRS 195.020.

■■■■■■ ■

A preliminary examination is not a trial; State v. Holt, 47 Nev. 233, 219 P. 557 (1923); Overton v. State, 78 Nev. 198, 370 P.2d 677 (1962). In all preliminary examinations conducted prior to January 1, 1968, the committing magistrate was not required to find the defendant guilty but only to find that a public offense had been committed, and that there was sufficient cause to believe the defendant guilty thereof; In re Kelley, 28 Nev. 491, 83 P. 223 (1905); In re Oxley and Mulvaney, 38 Nev. 379, 149 P. 992 (1915); Ex parte Molino, 39 Nev. 360, 157 P. 1012 (1916); Goldblatt v. Harris, 74 Nev. 74, 322 P.2d 902 (1958); Raggio v. Bryan, 76 Nev.

1, 348 P.2d 156 (1960); and, State v. Fuchs, 78 Nev. 63, 368 P.2d 869 (1962).

NRS 171.206,[1] which became effective January 1, 1968, somewhat relaxed the degree of responsibility placed upon a magistrate, for now the defendant shall be held to answer only if from the evidence it appears to the magistrate that there is probable cause to believe that an offense has been committed and that the defendant has committed it. There is no longer any requirement that the magistrate believe that the defendant is guilty of the offense charged. Maskaly v. State, 85 Nev. 111, 450 P.2d 790 (1969).

The evidence received at a preliminary examination must be legal evidence. In People v. Schuber, 163 P.2d 498 (Cal. App. 1945), that court said:

"The proof which will authorize a magistrate in holding an accused person for trial must consist of legal, competent evidence. No other type of evidence may be considered by the magistrate. The rules of evidence require the production of legal evidence and the exclusion of whatever is not legal. (Citations omitted.) The constitutional guarantee of due process of law requires adherence to the adopted and recognized rules of evidence. There cannot be one rule of evidence for the trial of cases and another rule of evidence for preliminary examinations. The rule for the admission or rejection of evidence is the same for both proceedings.

"The rule which requires less evidence at a preliminary examination, or even slight evidence, merely goes to the quantum, sufficiency or weight of evidence and not to its competency, relevancy or character."

Although the information filed in this case did not specifically charge the appellant and his co-defendants with the crime of conspiracy, the theory of the prosecution throughout the preliminary examination was that the appellant and his co-defendants had conspired to commit murder and thereby collect life insurance proceeds through the death of the victims.

---

[1]NRS 171.206. "If from the evidence it appears to the magistrate that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the magistrate shall forthwith hold him to answer in the district court; otherwise the magistrate shall discharge him. The magistrate shall admit the defendant to bail as provided in this Title. After concluding the proceeding the magistrate shall transmit forthwith to the clerk of the district court all papers in the proceeding and any bail taken by him."

It is not necessary to plead a conspiracy in an indictment or information if the evidence actually shows its existence. People v. Tanner, 44 P.2d 324 (Cal. 1935); People v. Massey, 312 P.2d 365 (Cal.App. 1957); James v. State, 109 S.E.2d 735 (Ga. 1959).

In the case before us, it was proper for the magistrate to admit, over the objection of the appellant, all of the testimony of the state's witnesses including the hearsay statements made by Goldsmith's co-conspirators. In Nevada, since 1886, it has not been necessary to establish a prima facie existence of a conspiracy before the hearsay statements of the co-conspirators could be admitted. However, before those hearsay statements can be considered by the magistrate it is incumbent upon him to examine all the other evidence to determine whether, aliunde, the existence of a conspiracy was established; State v. Beck, 42 Nev. 209, 174 P. 714 (1918); and, its admission is not reversible error if the conspiracy is subsequently shown; State v. Ward, 19 Nev. 297 (1886). In McNeil v. United States, 85 F.2d 698 (D.C.Cir. 1936), the court said: "There is rarely in a conspiracy case direct evidence of the conspiracy or proof of declarations. The evidence is nearly always circumstantial; and where such evidence is introduced disclosing conduct of persons charged with conspiracy which points to that unlawful end, it is permissible to produce it at any stage of the case. The obligation which the government assumes is to connect up the evidence so that when the case is submitted there is sufficient, when connected up, to show the guilt of the accused to the satisfaction of the jury beyond a reasonable doubt. Therefore, in all conspiracy cases great latitude in the introduction of testimony is allowed. It is enough that the evidence offered tends to elucidate the inquiry or to assist in determining the truth. Courts, as a general rule, do not reverse judgments because of the order in which testimony was received, or because some of it was irrelevant."

In People v. Massey, supra, the court said: "Direct evidence is not required to establish a conspiracy, but circumstantial evidence may be relied upon. This rule is sanctioned for the obvious reason that experience has demonstrated that as a general proposition a conspiracy can only be established by circumstantial evidence."

Although the existence of a conspiracy cannot be proved

by the extra-judicial statements of a co-conspirator, nevertheless, for the purpose of allowing the introduction of evidence of the extra-judicial acts and declarations of à conspirator, the conspiracy needs to be proved only to the extent of producing prima facie evidence of the fact. It need not be established by a preponderance of the evidence as in a civil action, nor beyond a reasonable doubt as in a criminal action. People v. Massey, supra.

In Burns v. State, 117 P.2d 155 (Okla. 1941), that court wrote: "It is equally well settled that the existence of a conspiracy must first be proved before a declaration of one not on trial is admissible against the defendant; but if there is competent evidence, however slight, of the conspiracy, the acts and declarations of a co-conspirator made during the consummation of the conspiracy may be admitted in evidence against the defendant."

We are satisfied that prima facie evidence established the existence of a conspiracy between Goldsmith and his co-defendants.

We next turn to consider whether the extra-judicial acts and declarations of Goldsmith's co-conspirator may properly be considered by the magistrate in determining probable cause to bind the appellant over to district court to answer upon the charge of murder or whether those acts or declarations are excluded under the hearsay rule of evidence.

Ordinarily, hearsay statements are excluded partly because the witness is likely to report it inaccurately, but principally because the original declarant cannot be cross-examined. However, when a conspiracy is once sufficiently established, acts and statements of a conspirator may be used against all engaged in the conspiracy. In the admission of this type of evidence the trial court has a wide discretion. Barkley v. United States, 66 F.2d 74 (4th Cir. 1933).

Under the common law exception to the hearsay rule covering the extra-judicial statements of co-conspirators, any act or declaration by one co-conspirator committed in furtherance of the conspiracy and during its pendency is admissible against each and every co-conspirator provided that a foundation for its reception is laid by independent proof of the conspiracy. State v. Ward, supra.

In VanRiper v. United States, 13 F.2d 961 (2d Cir. 1926), Judge Learned Hand said: "Such declarations are admitted upon no doctrine of the law of evidence, but of the substantive law of crime. When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common purpose, all do, and, as declarations may be such acts, they are competent against all."

In the light of this general rule we must examine the statements and acts of the co-conspirators Linn and Lucas as recited to the magistrate through the witnesses, Mattheis and LeMire.

In the posture of this case the conspiracy continued up to the time of the apprehension of the co-conspirators and for that reason the declarations made by Linn and Lucas to the witnesses, Mattheis and LeMire, were made during the pendency of the conspiracy. The only inference that can be drawn from the record is that the objective of the conspiracy was the insurance proceeds and the deaths of Robert Stucker and Larry Olinger were incidental thereto.

Even though a crime has been committed, the conspiracy does not necessarily end, but it continues until its aim has been achieved. A conspiracy to kidnap continued until the ransom money was passed; McDonald v. United States, 89 F.2d 128 (8th Cir. 1937). Similarly a robbery continued until the fruits of the crime had been disposed of; Murray v. United States, 10 F.2d 409 (7th Cir. 1925).

The statements made by both Linn and Lucas to the witnesses, Mattheis and LeMire, were likewise in furtherance of the conspiracy.

The declarations could have been inferred by the magistrate to have a twofold purpose. First the witnesses were both acquaintances of Goldsmith and might take the "message" to him, and secondly, the conspirators were scheming among themselves to procure the insurance proceeds which had been paid to the Alpine Investments, Inc., on the death of the victims, and the witnesses, Mattheis and LeMire, were bystanders and happened to hear the conversations. State v. Ward, supra.

In International Indemnity Co. v. Lehman, 28 F.2d 1, (7th Cir. 1928), the court said: "Construing the expression 'in furtherance of the conspiracy' reference is not to the *admission* as such, but rather to the *act* concerning which the admission is made; that is to say, if the act or declaration, concerning which

the admission or declaration is made, be in furtherance of the conspiracy, then it may be said that the admission is in furtherance of the conspiracy." Here the extra-judicial statements of the co-conspirators as related by the witness related directly to the acquisition of the insurance money and were in furtherance of the conspiracy.

We find that all the requirements for an exception to the hearsay rule were met, that the magistrate properly admitted all testimony by the state's witnesses and that it was proper for him to weigh their testimony in finding probable cause to bind the appellant over to the district court on the charge of murder.

The order of the district court denying the appellant's application for a writ of habeas corpus is affirmed.

COLLINS, C. J., ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.