NATHAN S. JACOBSON AND THOMAS JOSEPH BRUNO, APPELLANTS, v. THE STATE OF NEVADA, RESPONDENT.

No. 7113

May 30, 1973 510 P.2d 856

[Rehearing denied June 13, 1973]

*Thomas R. Sheridan,* of Los Angeles, California, and *Frank R. Petersen,* of Reno, for Appellants.

*Robert List,* Attorney General; *Robert E. Rose,* District Attorney, *Larry R. Hicks,* Chief Criminal Deputy District Attorney, and *Calvin R. X. Dunlap,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, THOMPSON, C. J.:

Nathan S. Jacobson and Thomas Joseph Bruno, who are charged with having committed the crimes of second degree kidnaping, false imprisonment and coercion, appeal from the denial of their petition for a writ of habeas corpus challenging probable cause to hold them for trial. Subordinately, they claim to have possessed lawful authority, either by reason of statute or the common law, to have detained Ray M. Landucci, the alleged victim of their conduct, in the manner they did.[1] We are asked to set aside the district court decision on the basis that the evidence upon which the State relies to establish probable cause is insufficient and, that the court's view of the law is incorrect.

Initially, however, we must rule upon a point raised by the State as to the availability of the remedy of habeas corpus to Jacobson and Bruno who have been released on bail pending trial.

1. The Remedy. A majority of the cases from other jurisdictions appear to hold that one at large on bail already enjoys the liberty he seeks by the writ of habeas corpus and that it is futile to direct the jailer to produce in court or release a prisoner he does not have in custody. Annot., 77 A.L.R.2d 1307. In this State, however, we have adopted a contrary view by statute, and by decision as well. NRS 34.360 grants the

---

[1]This appeal, No. 7113, is consolidated with appeals Nos. 7111 and 7112. Appeal No. 7111 is from a distirct court denial of habeas corpus following a grand jury indictment, and has been superseded by this appeal from a district court denial of habeas corpus following a subsequent criminal complaint and preliminary examination. Appeal No. 7112 is from an order denying a motion to change venue, and has since been dismissed without prejudice by this court on the ground that the motion and appeal were premature.

remedy of habeas corpus "to every person unlawfully committed, detained, confined or restrained of his liberty, under any pretense whatever." And, in Ex Parte Philipie, 82 Nev. 215, 414 P.2d 949 (1966), and In re Laiolo, 83 Nev. 186, 426 P.2d 726 (1967), we held that the remedy of habeas corpus may be utilized by one who is released on bail and who challenges the constitutionality of the statute or ordinance under which he is charged. Those decisions were so limited because the issue before the court was similarly limited. We now expand the pronouncements of those cases to one at large on bail who does not seek to test the constitutionality of the law under which he is charged, but does challenge probable cause to hold him for trial. It is evident that one who is in constructive custody by reason of bail, is subject to a form of restraint since the purpose of bail is to assure that he will attend upon the court when his presence is required. In re Petersen, 331 P.2d 24 (Cal. 1958). It is equally apparent that the availability of the Great Writ should not turn on whether the accused is illegally restrained by reason of a constitutionally infirm law, or because of insufficient proof to hold him to answer. We hold that the remedy is appropriate.

2. Probable Cause. An accused must be held to answer if it appears from the preliminary examination "that there is probable cause to believe that an offense has been committed, and that the defendant has committed it." NRS 171.206. The magistrate is not concerned with the sufficiency of the evidence to justify conviction. State v. Fuchs, 78 Nev. 63, 368 P.2d 869 (1962). Sufficient cause is shown to order those charged to stand trial if the evidence received will support a reasonable inference that they committed the crimes. Beasley v. Lamb, 79 Nev. 78, 378 P.2d 524 (1963).

Our review of the preliminary examination reveals substantial conflicts in the evidence on material points. In deciding probable cause, the magistrate apparently resolved those conflicts against the defendants and in favor of the State. It was permissible for him to do so. Miner v. Lamb, 86 Nev. 54, 464 P.2d 451 (1970). Our function on review is to determine whether his decision can find support in the evidence presented to him, giving full credit to such supportive evidence. In re Oxley and Mulvaney, 38 Nev. 379, 149 P. 992 (1915). Because of these well-established principles, we shall refer only to that evidence which apparently caused the magistrate to rule as he did.

The crimes are alleged to have occurred at Kings Castle, a

plush resort hotel and gaming casino at Lake Tahoe. The defendant Jacobson was the president of Kings Castle and in charge of operations. The defendant Bruno was his bodyguard. The alleged victim, Landucci, was employed at Kings Castle as a keno manager.

Landucci wished to test the honesty of a coemployee, one James Martin, before promoting him to a higher position. With this purpose in mind, he told Martin of a fraudulent keno plan, solicited his cooperation to carry it through, and advised Martin that he would telephone him later that evening to explain the plan in further detail. Landucci proposed to fire Martin if he was willing to participate in the scam; otherwise, he would promote him. Landucci did telephone Martin at Martin's house later that evening and did explain the plan in further detail. That telephone conversation, however, was monitored by Forrest Paull, a vice-president of Kings Castle, whom Martin had alerted and invited to eavesdrop. This circumstance started in motion the events which subsequently led to the criminal charges now before us.

Soon after that telephone communication, Paull met with Jacobson, his casino manager Farina, and the casino promotions manager Ferrara, and told them of Landucci's scheme. All except Jacobson believed that the best course would be to conduct a surveillance, allow the false keno ticket to be played, and then apprehend the winner before he left the premises. Jacobson preferred that Paull immediately interrogate Landucci. His preference was honored.

At approximately midnight on September 1, 1971, Paull commenced the interrogation of Landucci in Paull's upstairs office at the hotel. A security guard waited outside that office. Paull advised Landucci that he had monitored Landucci's telephone conversation with Martin. Landucci admitted the conversation and the content thereof. He told Paull of his purpose to test Martin's honesty and that there was no intention to actually carry out the suggested keno fraud. Landucci asked Paull, a qualified polygraph operator, to give him a lie detector test, but Paull would not do so. Paull told Landucci to give the right answers or "Nate would get them his way," referring to Jacobson. Landucci continued in his denial of any intention to carry out the fraud. After about forty minutes, Paull called Jacobson who soon came to the office with his bodyguard Bruno.

Paull related Landucci's story to Jacobson, left the office, and seated himself in the outside reception area with the security guard.

Jacobson was upset and angry. He called Landucci several obscene names. Landucci continued to deny any intention to carry out the fraud, and again asked to be given a polygraph examination, but was refused. Jacobson and Bruno struck Landucci about the head several times. Bruno then pulled a revolver from a desk drawer. He also had an automatic pistol which he loaded and cocked. Bruno threw the revolver in front of Landucci, pointed the automatic pistol at him, and told him to pick up the revolver. Landucci refused to do so. Bruno then picked up the revolver and threw it on the couch. He pointed the automatic pistol at Landucci, and told Jacobson to call an ambulance. At this point, Landucci told them that he would "give them whatever they wanted." Paull was called back into the office and wrote out a confession for Landucci to sign, and he did sign it because he was in fear of his life. The confession was signed at about 3:10 a.m., on September 2, 1971, and read: "I was going to set the machine back—Norm was going to come in at 9:30—was going to play undetermined amount of $5.00 5 spots. Marge was going to write the tickets on #3 machine—Martin going to blow his nose and comb his hair to signal all O.K. and that Martin was going to turn the machine back, going to take $4500.00 on the one ticket."

Jacobson ordered that Landucci be taken to another room where he remained under guard until about 4 p.m. on the afternoon of September 2, 1971. He was not permitted to use the telephone.

During the morning of September 2, a close surveillance was maintained for the unidentified "Norm" who was mentioned in the confession as the person who was to play the fraudulent keno ticket. James Martin and Marge were on duty and working as usual. The suspect player did not appear.

While Landucci was detained under guard at Kings Castle from midnight September 1 to 4 p.m., September 2, no one contacted law enforcement officers. Landucci testified that his confinement was against his will.

That evidence establishes probable cause. Second degree kidnaping is a felony and is defined by NRS 200.310(2).[2] The statute is quite broad, and designates alternative circumstances

---

[2]NRS 200.310(2). Every person who shall willfully and without authority of law seize, inveigle, take, carry away or kidnap another person with the intent to keep such person secretly imprisoned within the state, or for the purpose of conveying such person out of the state without authority of law, or in any manner held to service or detained against his will, shall be deemed guilty of kidnaping in the second degree.

which fall within its sweep. The crime is complete, for example, whenever it is shown that a person willfully and without lawful authority seizes another with the intent to keep him secretly imprisoned, or to detain him against his will. The proof of either alternative will support the charge. Jensen v. Sheriff, 89 Nev. 123, 508 P.2d 4 (1973), concerning section 1 of the statute.

 ██ █

It is the State's position that each of the mentioned alternatives was established. That is to say, that Landucci was secretly imprisoned by Jacobson and Bruno; also, that Landucci was, by them, detained against his will. Moreover, that such secret imprisonment and detention was accomplished willfully and without lawful authority. Whether Jacobson and Bruno possessed lawful authority will be considered later. That aspect aside, it was permissible for the magistrate to conclude that second degree kidnaping was shown to have occurred. Landucci was confined for some 16 hours in rooms, under guard, was interrogated, beaten, his life threatened, and was precluded from seeking help. These circumstances show a secret imprisonment; also, that Landucci was detained against his will. The requisite criminal intent may be inferred from such circumstances. Jensen v. Sheriff, supra. We reject out-of-hand the appellants' contention that there was not a legally sufficient asportation of Landucci, since everything occurred within Kings Castle. Jensen v. Sheriff, supra. Movement of the victim is only one of several methods by which the statutory offense may be committed. People v. Knowles, 217 P.2d 1, 6 (Cal. 1950).

The crime of false imprisonment is a gross misdemeanor and is "the unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority." NRS 200.460; Lerner Shops of Nevada v. Marin, 83 Nev. 75, 423 P.2d 398 (1967); Marschall v. City of Carson, 86 Nev. 107, 464 P.2d 494 (1970).

 █

Since it was permissible for the magistrate to conclude that there was sufficient confinement or detention to support probable cause for second degree kidnaping, it follows that sufficient confinement or detention likewise was shown to support probable cause for false imprisonment. Again, the aspect of whether the confinement or detention was without legal authority will be considered later.

▐

The crime of coercion is defined by NRS 207.190.[3] Since the record may be read to show that Jacobson and Bruno physically abused Landucci and forced him to confess, we cannot fault the magistrate's finding of probable cause on this charge.

3. **Lawful Authority.** Jacobson and Bruno contend that they possessed lawful authority to confine and detain Landucci by reason of NRS 465.101 and, also, by reason of a common law privilege to protect their property from theft. If they did possess such authority, the charges of second degree kidnaping and false imprisonment cannot stand. Of course, this issue does not touch the charge of coercion.

NRS 465.101 was added to our gaming law in 1971 and became effective on April 16 of that year.[4] Subject to limitations therein specified, that statute gives a gaming licensee or his agents the right to take any individual suspected of cheating

---

[3]NRS 207.190. 1. It is unlawful for any person, with intent to compel another to do or abstain from doing an act which such other person has a right to do or abstain from doing, to:

(a) Use violence or inflict injury upon such other person or any of his family, or upon his property, or threaten such violence or injury; or

(b) Deprive such person of any tool, implement or clothing, or hinder him in the use thereof; or

(c) Attempt to intimidate such person by threats or force.

2. Any person who violates the provisions of subsection 1 shall be punished:

(a) Where physical force or the immediate threat of such force is used, by imprisonment in the state prison for not less than 1 year nor more than 6 years.

(b) Where no physical force or immediate threat of such force is used, for a misdemeanor.

[4]NRS 465.101. 1. As used in this section:

(a) "Establishment" has the meaning ascribed to it in NRS 463.0109.

(b) "Licensee" has the meaning ascribed to it in NRS 463.0119.

2. Any licensee, or his officers, employees or agents may question any individual in his establishment suspected of violating any of the provisions of NRS 465.080. No licensee or his officers, employees or agents shall be criminally or civilly liable on account of any such questioning.

3. Any licensee or his officers, employees or agents who have probable cause for believing that there has been a violation of NRS 465.080 in his establishment by any individual may take such person into custody and detain him in the establishment in a reasonable manner and for a reasonable length of time. Such taking into custody and detention shall not render such licensee or his officers, employees or agents, criminally or civilly liable for false arrest, false imprisonment, slander or unlawful detention unless such taking into custody and detention are unreasonable under all the circumstances.

4. No licensee, or his officers, employees or agents are entitled to

(NRS 465.080) into custody, detain him in the establishment and question him. If the limitations of the statute are honored, the licensee or his agents are granted an immunity from criminal and civil liability for false arrest, false imprisonment, slander or unlawful detention.

The right to detain and question, and the correlative grant of immunity, however, are limited in scope. First, the right to detain and question does not exist unless the licensee or his agents have probable cause to believe that the individual has violated NRS 465.080. Second, if such probable cause exists, the licensee or his agents may take such individual into custody and detain him in the establishment only in a reasonable manner and for a reasonable length of time. Third, the statutory immunity does not exist unless there is displayed in a conspicuous place in the establishment a notice in boldface type, clearly legible, and substantially in the following form: "Any gaming licensee, or his officers, employees or agents who have probable cause for believing that any person violated any provision of NRS 465.080 prohibiting cheating in gaming may detain such person in the establishment for the purpose of notifying a peace officer."

NRS 465.010 does not touch this case. Landucci did not violate nor was he suspected of violating any provision of NRS 465.080. The latter statute specifies unlawful acts and conduct "for any person playing any licensed gambling game." Landucci did not play a licensed gambling game and does not, therefore, fall within that statute. Consequently, we need not decide whether the legislature intended that the provisions of NRS 465.101 and 465.080 in combination are to apply only to customers and not to employees. Neither must we determine whether the right to detain one suspected of cheating was granted the licensee for the purpose of notifying a peace officer, or for other purposes as well. We hold that Jacobson and Bruno did not possess lawful authority to confine and detain Landucci by reason of NRS 465.101.

---

the immunity from liability provided for in this section unless there is displayed in a conspicuous place in his establishment a notice in boldface type clearly legible and in substantially this form:

> Any gaming licensee, or his officers, employees or agents who have probable cause for believing that any person violated any provision of NRS 465.080 prohibiting cheating in gaming may detain such person in the establishment for the purpose of notifying a peace officer.

If one has reasonable grounds to believe that another is stealing his property he may be justified in detaining such person for a reasonable time in order to investigate. Lerner Shops v. Marin, 83 Nev. 75, 78, 423 P.2d 398 (1967). This common law privilege, if properly exercised, is a defense to an action for false imprisonment.

The record does not suggest that the defendants-appellants believed that their property had been stolen. Giving full credit to their theory of the case, they knew only of an effort to perpetuate a fraud. Since there was no probable cause to believe that a fraud had occurred, this contention must fail.

For the reasons expressed, the ruling of the district court is affirmed.

MOWBRAY and BATJER, JJ., concur.

ZENOFF, J., with whom GUNDERSON, J., agrees, dissenting:

We believe the majority draft is too understated. The facts in their totality reflect the circumstances of this case as being both unique and bizarre, more characteristic of a T.V. scenario than real life drama.

The chief witnesses were Forrest Paull, Vice President of King's Castle, who testified on behalf of the state under a promise of immunity, and Ray Landucci, Keno Manager and the purported culprit in a "scam" to beat the house out of a substantial sum of money by rigging a Keno machine. He solicited the help of employee James Martin whom he said he distrusted but was still intending to promote to a higher position, he said, in the Keno department. Landucci had a sparse knowledge of electronics and demonstrated once earlier to Martin how, through the use of electronics, a Keno machine could be "adjusted," but the attempt merely blew a fuse. He contacted Martin more than once by telephone to further his fraudulent plan but by this time Martin had told Paull of Landucci's intentions and Paull secretly monitored the telephone conversations.

Paull notified Jacobson who refused to allow the scheme to go forward to completion. Instead Jacobson instructed Paull to tell Landucci that the plan was discovered and get him to confess and to help catch the co-conspirator.

Paull invited Landucci to accompany him to Paull's office where they remained outside Paull's office near the casino proper, while Paull advised Landucci that he knew what was

going on and questioned him. Landucci's explanation was that he had in mind to promote Martin but wanted to test his honesty. He admitted that that was not his proper function, that his duty was to inform Paull, his superior, of any suspected dishonesty of an employee. He had never taken it upon himself before to check an employee's honesty. Paull testified that being a qualified polygraph operator it would be fruitless to give Landucci a polygraph examination because Landucci by this time was much too nervous and was crying.

The record is voluminous, but whatever facts were presented by Landucci they were refuted, modified or denied by Paull and Reynolds, the security guard, and by Martin who had denied any guilty complicity and who had passed a polygraph examination in connection with his story of the event. The agreed factors are that the plan to cheat King's Castle originated with Landucci and that he proposed it to Martin who reported it to Paull who reported it to Jacobson. Whatever the truth of the additional facts, it is clear that Landucci had no desire or inclination to prosecute this action. Somehow or another, unclear from the record, agents of the Federal Bureau of Investigation came into knowledge of the events shortly after they occurred. They interviewed Landucci who said then he wanted to carry it no further. The F.B.I. agent took 18 photographs of Landucci but the photographs were never admitted into evidence, so we don't know if he bore visible bruises of a beating. There is inference from the record that he did not.

The F.B.I. turned the story over to the Washoe County sheriff's office who called Landucci in for interrogation. Thereafter, for the next few weeks he spent his time unemployed except for recreational hunting and the like. His work effort consisted of contacting Paull who met him at a gasoline station away from King's Castle, the purpose of which was to try to convince King's Castle that they should put in a favorable report so that Landucci could obtain unemployment benefits. His requests were refused and he never was approved for unemployment benefits even after a hearing before an appropriate board.

In the early morning hours on the day in question at Paull's office after Paull had questioned Landucci, Paull notified Jacobson who came in with Bruno, a newly hired bodyguard. Paull left the office. Thereafter, the truth of the events which allegedly took place, to wit, alleged beatings and threats, together with a display of a gun by Bruno, are debated pro and con. This much is clear, that Landucci during the course of the

interrogation left Paull's office, greeted the security guard, walked down the corridor to get a drink of water, returned and at all times could have left at any time. He stated himself that he was scared, that he was upset and that he really wasn't certain whether he was held against his will or not. His impression was that he could walk out but that Jacobson could have him arrested or that he could stay in the hotel and assist in the apprehension of a third party who was to collect the money when the false Keno game was accomplished. In the event of the latter he would be showing his cooperation to clear the matter up. The question of the refusal to allow him to use the telephone was to prevent him from issuing a warning to any co-conspirator but Paull did call Landucci's wife and tell her that her husband was working an additional shift. Despite Landucci's testimony that Bruno threatened him with a gun and struck him during the course of the long period of time Landucci, Jacobson and Bruno were alone in Paull's office, Landucci could not recognize Bruno who was seated in the courtroom near the witness stand. It should be remembered further that Landucci told the District Attorney's office and the sheriff's office that he wanted all prosecutorial efforts stopped in connection with this incident and this was prior to his meeting with Paull at the gasoline station.

The fantastic, almost unbelievable circumstances provide the foundation for our determination of whether a kidnapping took place, a false imprisonment and a coercion. It is undisputable that the record discloses probable cause for a jury determination on the issue of coercion but the same cannot be said for kidnapping.

1. Kidnapping. We said in Jensen v. Sheriff, 89 Nev. 123, 508 P.2d 4 (1973), that kidnapping implies an asportation, a carrying away of a person and that is the generally accepted view of kidnapping as distinguished from false imprisonment. There was no carrying away here in the sense that we defined kidnapping in the Jensen case. Even if Landucci's presence in Paull's office had been inveigled, his own understanding at all times that he could leave when he desired negates that he was secretly imprisoned. Because a security guard was seated outside the door does not necessarily mean that the security guard was supposed to keep Landucci within the premises. Landucci never asked if he could leave and didn't try to leave and made no attempt to leave the King's Castle premises. A wide open incident such as this defies the realities that surround a kidnapping of any degree.

2. False imprisonment. If we were concerned only with

false imprisonment, probable cause does exist to take this matter to trial on that issue. But the defendants seek to excuse their purported conduct on the authority of NRS 465.101 and NRS 465.080. The latter statute allows a gaming licensee or his agents the right to take any individual suspected of cheating into custody, detain him in the establishment, question him and call the law. The licensee or his agents are granted immunity from criminal and civil liability for false arrest, false imprisonment, slander or unlawful detention. The limitations to these privileges are that the licensee or his agents must have probable cause to believe that the individual has violated NRS 465.080 and if such probable cause exists, the individual may be taken into custody and detained only in a reasonable manner and for a reasonable length of time. A third requirement is that signs be displayed conspicuously in the gaming establishments. The record shows that King's Castle displayed in many areas, including the restrooms, the required signs that told the dangers of cheating.

We must therefore determine whether the statute means that only customers who are suspected of cheating fall within the statute. The trial judge stated that he had read the legislative history of the statute and was of the opinion that only customers were intended. There is no reason to grant immunity when customers cheat yet withhold it when employees cheat since gaming employees are more knowledgeable of cheating methods than customers are. All cheating, no matter by whom committed, is to be discouraged. The overall purpose is to stop cheating of gaming establishments and fine-line distinctions having no purpose should not be entertained.

This then resolves into whether or not the King's Castle officials acted reasonably in detaining Landucci if he were in fact detained at all, and if so, whether the detention was in a reasonable manner and for a reasonable length of time. The question is, if Jacobson and Bruno did falsely imprison Landucci, are they protected by the immunity statute or did they exceed the limits of reasonableness?